07-2689-ag
*Jian Hui Shao v. Mukasey*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: August 6, 2008                    Decided: October 10, 2008)

Docket No. 07-2689-ag

JIAN HUI SHAO,

*Petitioner,*

—v.—

MICHAEL B. MUKASEY,
ATTORNEY GENERAL OF THE UNITED STATES,

*Respondent.*

Docket No. 07-2666-ag

JI WEN SHI,

*Petitioner,*

—v.—

MICHAEL B. MUKASEY,
ATTORNEY GENERAL OF THE UNITED STATES,

*Respondent.*

1

_____

SHOW YUNG GUO,[1]

*Petitioner,*

—v.—

MICHAEL B. MUKASEY,
ATTORNEY GENERAL OF THE UNITED STATES,

*Respondent.*[2]

Before:

RAGGI, WESLEY, AND LIVINGSTON, *Circuit Judges.*

_____

Petitioners are Chinese nationals who assert a fear of future persecution — specifically, forced sterilization — if removed to China based on their each having fathered or given birth to more than one child, whether in China or in the United States, in violation of China's population control policies limiting a family to one child. On remand of their cases from this court, the Board of Immigration Appeals has now issued precedential decisions concluding that the statutory definition of "refugee" cannot be construed categorically to exclude or include all Chinese nationals with more than one child. Rather,

_____

[1] When last before this court, petitioner's name was spelled "Shou Yung Guo." See Shou Yung Guo v. Gonzales, 463 F.3d 109 (2d Cir. 2006). Having consulted with counsel and confirmed that the preferred spelling is that used in the petition now before the court, we employ "Show Yung Guo" in this opinion.

[2] Pursuant to Fed. R. App. P. 43(c)(2), "Michael B. Mukasey, Attorney General of the United States," is automatically substituted for former Attorney General Alberto R. Gonzales as necessary in all the cases decided in this opinion. The Clerk of Court is directed to amend the captions in these cases to conform to the above listing of petitioners and respondent.

case-by-case review is necessary to determine whether an alien with two or more children demonstrates a well-founded fear of future persecution. Petitioners do not challenge the BIA's construction of the statute. Instead, they seek review of the BIA's determination that, on a case-by-case analysis of (1) the government policy implicated by the births at issue, (2) the degree to which government officials would view the births at issue as violative of that policy, and (3) the enforcement means that would apply to any perceived violation, none of the petitioners has demonstrated a well-founded fear of future persecution sufficient to secure relief either on direct agency review of removal proceedings (as sought by Jian Hui Shao and Ji Wen Shi) or on a motion to reopen those proceedings (as sought by Show Yung Guo).

Petitions for Review DENIED.

_____

Gary J. Yerman, New York, New York, *for* Petitioner Jian Hui Shao.

Gary J. Yerman, New York, New York (Richard Tarzia, Belle Mead, New Jersey, *on the brief*), *for* Petitioner Ji Wen Shi.

Gang Zhou, New York, New York, *for* Petitioner Show Yung Guo.

Thomas H. Dupree, Jr., Deputy Assistant Attorney General (Aimee J. Frederickson and Michele Y. F. Sarko, Attorneys; Susan Houser, Senior Litigation Counsel; and Mary Jane Candaux, Michelle G. Latour, and Carl H. McIntyre, Assistant Directors, *on behalf of* Jeffrey S. Buchholtz and Gregory G. Katsas, Acting Assistant Attorneys General, *on the brief*), Office of Immigration Litigation, United States Department of Justice, Civil Division, Washington, D.C., *for* Respondent.

_____

3

REENA RAGGI, *Circuit Judge*:

In response to reports that China was enforcing its "one family, one child" population control policy through forced abortions and forced sterilizations, in 1996, Congress expressly extended the Immigration and Nationality Act's definition of a political "refugee" to include persons who had "been forced to abort a pregnancy or to undergo involuntary sterilization, or who [had] been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program," as well as persons who have "a well founded fear" that they "will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance." 8 U.S.C. § 1101(a)(42); see Ke Zhen Zhao v. U.S. Dep't of Justice, 265 F.3d 83, 91-92 (2d Cir. 2001) (discussing background to change in law). These three petitions involve Chinese nationals who have not claimed or credibly demonstrated that they had personally experienced or been threatened with any such persecution. Nevertheless, they assert that their fear of such future persecution is well founded because they have fathered or given birth to more children than are authorized under Chinese population control policies. We address these petitions in a single opinion because similar well-founded fear claims are now pending in hundreds of petitions for review to this court, and these three cases present us with the precedential responses from the Board of Immigration Appeals ("BIA") to the common question raised in the different contexts of these cases: under what circumstances can a Chinese national rely on the birth of more than one child to demonstrate the well-founded fear of persecution necessary to qualify for asylum

4

as a "refugee"? See In re J-H-S-, 24 I. & N. Dec. 196 (B.I.A. 2007) (addressing issue on direct review with respect to children born in China); In re J-W-S-, 24 I. & N. Dec. 185 (B.I.A. 2007) (addressing issue on direct review with respect to children born in United States); In re S-Y-G-, 24 I. & N. Dec. 247 (B.I.A. 2007) (addressing issue on motion to reopen with respect to one child born in China and second child born in United States).

The BIA has determined that the question admits no categorical answer, largely because of local variations in Chinese officials' understanding and enforcement of their nation's birth control policies. Thus, the Board has declined to construe the statutory term "refugee" to exclude or to include all Chinese nationals who have fathered or given birth to more than one child. Rather, it has determined that a case-by-case review is necessary to identify which Chinese nationals with two or more children demonstrate a fear of future persecution that is both subjectively genuine and objectively reasonable. See Jian Xing Huang v. INS, 421 F.3d 125, 128 (2d Cir. 2005) (noting subjective and objective components of well-founded fear claim); Ramsameachire v. Ashcroft, 357 F.3d 169, 178 (2d Cir. 2004) (same). No party before the court on these petitions challenges this flexible construction of the statute.

Instead, each petitioner faults the BIA's analysis of the evidence in his or her particular case, an analysis generally informed by a three-part inquiry: has petitioner (1) identified the government policy implicated by the births at issue, (2) established that government officials would view the births as a violation of the policy, and (3) demonstrated

5

a reasonable possibility that government officials would enforce the policy against petitioner through means constituting persecution? Because we identify no legal error in this evidentiary framework and because substantial evidence supports the BIA's findings that each of the petitioners failed to demonstrate that his or her stated fears of persecution on return to China were objectively reasonable, we deny these petitions for review.[3]

## I.    Background

Although the three petitions before us present a common issue, they do so in different factual and procedural contexts that we outline briefly at the outset: (1) in Jian Hui Shao's case, the BIA reviewed (a) on direct appeal (b) an order of removal (c) against a male petitioner generally found not credible except for the fact that (d) he had fathered two children in China before fleeing to the United States; (2) in Ji Wen Shi's case, the agency reviewed (a) on direct appeal (b) a grant of relief from removal (c) to a credible male applicant (d) who had married and fathered two children in the United States after fleeing China; and (3) in Show Yung Guo's case, the agency considered (a) a motion to reopen (b) by a woman previously found not credible except for the fact that (c) she had given birth to two children, one in China and one in the United States, but who (d) now offered various documents from family planning authorities in her native province and town to support a claim of changed country conditions giving rise to a fear of future persecution based simply

---

[3] Although we review the denial of Show Yung Guo's motion to reopen only for abuse of discretion, see infra at **[57]**, our identification of substantial record evidence supporting the BIA's factual findings permits us readily to conclude that the agency's decision-making in this case was not arbitrary or capricious.

6

on the number of her children. The BIA's initial rulings denying relief in each case prompted petitions for review in this court, each of which resulted in remands, in two cases by court order, see Jian Hui Shao v. BIA, 465 F.3d 497 (2d Cir. 2006); Shou Yung Guo v. Gonzales, 463 F.3d 109 (2d Cir. 2006), and in the case of Ji Wen Shi by stipulation of the parties. Preliminary to discussing the challenged precedential decisions prompted by these remands, we briefly recount the events leading to those decisions.

A.     Proceedings Leading to Precedential Decisions

1.     Jian Hui Shao

a.     Initial Agency Proceedings

In February 2002, Jian Hui Shao, a native of Fuzhou City in China's Fujian Province, attempted to enter the United States unlawfully. In subsequent removal proceedings, Jian Hui Shao conceded removability but applied for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq., and for relief under the Convention Against Torture ("CAT"). Jian Hui Shao asserted that he feared forcible sterilization in China because he had fathered two daughters in that country and Chinese law prohibited him, a non-agricultural worker, from having more than one child. To demonstrate the reasonableness of his fear — and to explain his abandonment of his wife in China only weeks after discovering her second pregnancy — Jian Hui Shao testified that he had been beaten and jailed by Chinese officials after his wife missed a gynecological examination intended to ensure her compliance with family planning policies and he refused to disclose

7

her whereabouts.

Identifying various inconsistencies and implausibilities in Jian Hui Shao's account, the immigration judge ("IJ") found him not credible in all respects but one: the fact that he now had two children in China. See In re Jian Hui Shao, No. A 79 759 247, at 14-15 (Immig. Ct. N.Y. City Feb. 27, 2003). The IJ denied petitioner relief from removal, a determination summarily upheld by the BIA on initial direct review. See In re Jian Hui Shao, No. A 79 759 247 (B.I.A. June 28, 2004).

b.      Proceedings in this Court

On Jian Hui Shao's initial petition for review by this court, we concluded that the agency's adverse credibility determination was supported by substantial evidence. See Jian Hui Shao v. BIA, 465 F.3d at 500-01. Nevertheless, we remanded the case for further agency consideration of the question "under what circumstances, if any, having two children in China is sufficient grounds for a well-founded fear of future persecution." Id. at 501.

In so ruling, we noted that, in Jian Xing Huang v. INS, this court had "expressed skepticism" as to whether an alien with two children born in the United States could demonstrate a well-founded fear of forced sterilization on removal to China "absent specific facts — beyond the general conditions in China — giving rise to his subjective fear." Jian Hui Shao v. BIA, 465 F.3d at 501 (citing Jian Xing Huang v. INS, 421 F.3d at 129). Nevertheless, because Jian Hui Shao's children "were born in and live in China," we considered the possibility that such circumstances might warrant a different assessment of

8

the objective reasonableness of petitioner's professed fear.  Id.  (emphasis added).  Noting that the INA's definition of a "refugee" did not clearly resolve the issue and that the BIA — the agency charged with the INA's enforcement and thus entitled to deference with regard to the statute's interpretation — had not previously considered the point, we decided to remand.  See id. at 501-03 (citing Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984); Shi Liang Lin v. U.S. Dep't of Justice, 416 F.3d 184, 189-91 (2d Cir. 2005)).  In making that determination, we noted the far-reaching implications of any decision:  Jian Hui Shao's circumstances were shared by "innumerable potential asylum applicants" and the grant of asylum to all persons with more children than allowed by China's family planning policies would raise "complicated" foreign and public policy questions.  Id. at 502.  Thus, we observed that "a precedential decision by the BIA — or the Supreme Court of the United States" was desirable to assure uniformity in such cases.  Id. We anticipated that the remand question might not admit a single answer applicable throughout China.  We observed that the BIA was "better prepared" than federal circuit courts "to evaluate whether different regions of China enforce divergent family planning policies and whether applicants from diverse locales should accordingly receive different treatment in asylum proceedings."  Id.

     2.    Ji Wen Shi

     a.    Order of Removal

In July 1992, Ji Wen Shi, a native of Changle City in Fujian Province, attempted to

enter the United States unlawfully. Failing to appear for his removal proceedings in January 1993, Ji Wen Shi was initially ordered removed in absentia.

b.      Grant of Reopening and Relief from Removal

In fact, Ji Wen Shi remained in this country illegally for several years, marrying another Chinese national in 1999 and fathering his first child, a son, in 2000. In May 2001, while his wife was pregnant with the couple's second son, Ji Wen Shi moved to reopen his removal proceedings, attributing his 1993 absence to getting lost on the way to the immigration court as the result of taking the wrong bus. Because the agency granted the motion, we have no reason to consider Ji Wen Shi's eight-year delay in proffering this explanation. We note only that, upon reopening, Ji Wen Shi applied for asylum, withholding of removal, and CAT relief based on a purported fear that, if he and his wife were to return to China, one or the other would be forcibly sterilized for having violated the country's one-child policy. In addition, Ji Wen Shi claimed that he feared that he would be jailed, beaten, and tortured upon return to China because he had left the country without authorization.

Finding Ji Wen Shi to have testified credibly, the IJ concluded that petitioner had established that he had a well-founded fear of being forcibly sterilized on return to China and granted him asylum. See In re Ji Wen Shi, No. A 72 459 654 (Immig. Ct. N.Y. City May 16, 2003).

c.      Reversal of the Grant of Relief

On appeal to the BIA, the government argued that, as a matter of law, Ji Wen Shi did

10

not fit within the statutory definition of a "refugee" because he had not been subjected to any coercive measures and his fear of future mistreatment was merely speculative. In reversing the IJ's grant of relief from removal, the BIA did not attempt to resolve the government's legal challenge categorically. Instead, focusing on the record evidence developed in the particular case, the BIA ruled that, even if Ji Wen Shi had demonstrated a credible subjective fear of future sterilization, he had failed to adduce evidence demonstrating that the fear was objectively reasonable. See In re Ji Wen Shi, No. A 72 459 654 (B.I.A. Sept. 14, 2004). The BIA particularly noted the lack of evidence of any national Chinese policy regarding the treatment of parents of foreign-born children. To the extent Ji Wen Shi attempted to fill this gap with an affidavit from demographer John Shields Aird indicating that persons returning to China from abroad with unauthorized children can "hardly expect" to be afforded leniency under the nation's one-child policy, the BIA concluded that this evidence showed only that Ji Wen Shi may face "sanctions and penalties" upon return to China, not that those penalties would rise to the level of persecution. Id. at 2. The BIA further determined that the possibility of Ji Wen Shi and his wife having another child was too speculative to warrant relief from removal. See id. As to Ji Wen Shi's assertion that he feared incarceration in light of his illegal departure from China, the BIA concluded that petitioner had failed to demonstrate that any punishments imposed would, in fact, amount to torture under the CAT, or be based on any of the enumerated protected grounds under the INA. See id. at 1-2.

11

### d. Stipulated Remand from the Petition for Review

Ji Wen Shi petitioned this court for review but, in January 2006, before the case was heard, the parties stipulated to a remand to allow the BIA (1) to address evidence accompanying the Aird affidavit, (2) to explain further its conclusion that Ji Wen Shi had not demonstrated an objectively reasonable fear of forced sterilization if returned to China, and (3) to consider Ji Wen Shi's claim in light of this court's recent decision in Jian Xing Huang v. INS, 421 F.3d 125.

### 3. Show Yung Guo

#### a. The Agency Proceedings Resulting in an Order of Removal

Show Yung Guo, another native of Changle City in Fujian Province, attempted to enter the United States illegally in October 1992. In her initial airport interview, she stated that she had two children and feared forced sterilization were she to return to China. In March 1993, however, she applied for asylum and relief from removal on the ground that she feared forced sterilization in China based on her violation of that country's one-child policy because she had given birth to one child in China and wished to have more children with her husband. By the time Show Yung Guo testified at a merits hearing in January 1996, she could point to the birth of another child in the United States as further support for her claim, and testified she had a total of three children, one of whom she had adopted in China. Further, Show Yung Guo testified to past persecution in China in the form of mandatory IUD implants, despite adverse health effects, and a forced abortion and threatened sterilization.

Identifying numerous inconsistencies among Show Yung Guo's airport interview, her asylum application, and her hearing testimony, and taking note of her unconvincing demeanor, the IJ found petitioner not credible except to the extent she had demonstrated that she had given birth to one child in China and one in the United States. See In re Show Yung Guo, No. A 72 461 714, at 7-9 (Immig. Ct. N.Y. City Jan. 25, 1996). Finding no credible evidence of past persecution in China, the IJ concluded that Show Yung Guo had not demonstrated a well-founded fear of future forced sterilization on removal to that country because she offered no evidence that the birth of a second child in the United States would be deemed a violation of Chinese policy. See id. at 10-11. Accordingly, the IJ ordered removal.

The BIA upheld this ruling on direct appeal, see In re Show Yung Guo, No. A 72 461 714 (B.I.A. Aug. 21, 1997), and Show Yung Guo did not petition this court for review.

b.      First Motion to Reopen

In June 1999, Show Yung Guo moved the BIA to reopen her removal proceedings, indicating that she wished to apply for CAT relief. Reiterating her claim that she had a total of three children, Show Yung Guo asserted that her past experiences with Chinese family planning authorities convinced her that she would be forcibly sterilized if returned to her native country. The BIA denied the motion in June 2002, noting that Show Yung Guo had not challenged the agency's prior adverse credibility determination, much less explained the record inconsistencies informing that determination. See In re Show Yung Guo, No. A 72

13

461 714 (B.I.A. June 11, 2002). Her failure credibly to demonstrate past persecution or a well-founded fear of future persecution thus not only defeated her INA claims for asylum and withholding of removal, but also precluded her from showing the likelihood of future torture necessary to secure CAT relief. See id. at 2.

c.      Second Motion to Reopen

In September 2003, Show Yung Guo again moved to reopen, this time claiming changed country conditions with respect to the enforcement of China's population control policies against nationals returning from abroad. In support, petitioner presented two documents issued by Changle City and Fujian Province family planning authorities that responded to an inquiry about the application of population policy limits to an individual named Zheng Yu He, whose wife had given birth to a second child while traveling in the United States. Both authorities indicated that population limits were enforceable against Chinese nationals who violated family planning regulations while abroad unless the national had acquired legal permanent residence or three years' legal temporary residence in the foreign country. See May 22, 2003 Administrative Opinion On Sanctions Against Family-Planning Violations, issued by the Changle City Family-Planning Administration ("2003 Changle City Administrative Opinion") ¶ 2; 2003 Administrative Decision on Request for Directive from Fuzhou City Administration on Family-Planning in Connection with Birth of a Second Child by Zheng Yu He of Changle City Municipal Bureau of Construction and His Spouse in USA, issued by the Fujian Province Department of Family-Planning

14

Administration ("2003 Fujian Province Administrative Decision") ¶ 2. While these two documents did not reference any particular enforcement method that might apply in the circumstances at issue, Show Yung Guo offered a third document indicating that sterilization was "mandatory" in Changle City upon the birth of a second child. See Q & A for Changle City Family-Planning Information Handbook (July 1999) ("1999 Q & A Handbook") ¶ 16.[4]

The BIA summarily denied Show Yung Guo's second motion to reopen, finding that the documents at issue were "new" but insufficient to show the "changed circumstances" required by the applicable regulation. In re Show Yung Guo, No. A 72 461 714 (B.I.A. Jan. 22, 2004); see 8 C.F.R. § 1003.2(c)(3)(ii).

### d. Proceedings in this Court

On Show Yung Guo's petition for review of the denials of her motions to reopen, this court ruled that the BIA had acted within its discretion in denying the first motion because petitioner had failed to support her proposed CAT claim with any "additional evidence beyond the story deemed false in the asylum hearing." Shou Yung Guo v. Gonzales, 463

---

[4] The 1999 Q & A Handbook states in relevant part:

What birth-control measures are to be imposed upon birth of a first child / a second child pursuant to the provincial family planning regulations?

A:    An IUD insertion is mandatory upon birth of a first child; sterilization upon birth of a second child.

1999 Q & A Handbook ¶ 16. The identical question and answer appears in the 2005 version of the handbook. See Changle City Family-Planning Information Promotion Q & A for General Public (Mar. 2005) ("2005 Q & A Handbook").

15

F.3d at 114. At the same time, however, we identified error in the BIA's assessment of the evidence Show Yung Guo marshaled in support of her second motion. Id. at 115. We noted first that the proffered official documents were obviously "not available" at the time of petitioner's removal hearing because they all post-dated those proceedings. Id. We further characterized the documents as "unquestionably" material to the issue of whether conditions in China had changed to expose returning Chinese nationals with two children to forced sterilization. Id. Concluding that "[i]t is not apparent to us that the BIA ever really paid any attention to the documents," we remanded the case to the BIA with directions "to consider Guo's evidence of changed circumstances" and to determine "whether, in light of any such circumstances, she can establish a well-founded fear of persecution." Id.

B.    The Challenged Precedential Decisions

With this background to how the BIA came to afford each of these three cases further review, we summarize the challenged precedential decisions.

1.    Jian Hui Shao

a.    The Need for Case-by-Case Analysis to Identify Aliens Who Demonstrate a Well-Founded Fear of Future Persecution Based on the Birth of More than One Child

On June 7, 2007, a three-member panel of the BIA addressed the question posed by this court in its remand order: is "having two children in China . . . sufficient grounds for a well-founded fear of persecution"? Jian Hui Shao v. BIA, 465 F.3d at 501. The BIA determined that the question admitted no categorical answer; it could be resolved only on a

16

case-by-case basis.

> [A]n alien who has established that he or she has had two children in China may qualify as a refugee if the evidence presented establishes, on a case-by-case basis, that the births violated family planning policies in that alien's local province, municipality, or other locally-defined area, and that current local family planning enforcement efforts would give rise to a well-founded fear of persecution because of the violation.

In re J-H-S-, 24 I. & N. Dec. at 197-98 (emphasis added). The response, which presumes an alien's demonstration of a genuine subjective fear of future persecution, focuses on the showing necessary to demonstrate that such a fear is sufficiently objectively reasonable to allow the alien to claim refugee status.

The BIA concluded that the objective reasonableness of such a fear could be best determined by reviewing the record evidence in three steps. The first step, or "starting point for determining whether there is objective evidence supporting this fear [of future persecution,] is proof of the details of the family planning policy relevant to each individual case." Id. at 198. The BIA explained that this step is necessary because, "[a]lthough in general China's family planning policy has been termed a 'one child' policy," id., "in practice it is apparent that deviations from the general rule of 'one child' persist," id. For example, "certain geographic and ethnic factors" may prompt "exceptions to the 'one child' policy." Id. at 199. Thus, the petitioner first had to "establish[] the details of the specific 'policy' applicable in his or her case." Id.

At the second step of analysis, the agency would consider "whether the facts in the

17

record establish that the alien violated the policy" applicable to his circumstances. Id. By way of illustration, the BIA noted that if, at the first step, an alien established that no exceptions to the "one child" policy applied in the particular case, the second step inquiry reduced to whether the alien had demonstrated that he or she had, in fact, fathered or given birth to "more than one child, in violation of that policy." Id. This latter burden could be carried by introducing birth certificates or other documents evidencing the children's births. See id. The BIA specifically noted that, although it identified these first two steps of analysis in a case involving children born in China, the inquiries were especially relevant in cases where the alien seeking relief from removal relied on the birth of children in the United States. See id.

Assuming that an alien could satisfy the "policy" and "violation" steps of analysis, a third step required him to "establish that the violation of the family planning policy would be punished in the local area in a way that would give rise to an objective fear of future persecution."[5] Id. The BIA explained that this was necessary because "enforcement of the

---

[5] We note that in none of the three cases here at issue did the government argue that petitioners could avoid future persecution by relocating to another region in China. See 8 C.F.R. § 208.13(b)(2)(ii) ("An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country . . ., if under all the circumstances it would be reasonable to expect the applicant to do so"); id. § 208.13(b)(3)(ii) (placing the burden of proving reasonableness of relocation on government where "the persecutor is a government or is government-sponsored"); see also Jin Xiu Chen v. U.S. Dep't of Justice, 468 F.3d 109, 111 (2d Cir. 2006) (noting, in remanding in light of Shou Yung Guo, 463 F.3d 109, that "[r]eturning a person to a part of China where he or she will face an officially sanctioned policy of forced sterilization would appear to violate United States law . . . except where the government has met its burden of

18

[one-child] policy varies greatly" in China, "depending on locality." Id. at 200. The BIA further noted that while "incentives and pressure" were used to achieve compliance with birth control limitations, id. at 200, national policy proscribed the use of physical force, id. at 203. Thus, it was an alien's burden to adduce some evidence showing "that he or she personally faces a well-founded fear of persecution — generally, forced abortion or sterilization," id. at 200 (emphasis added), or economic sanctions so "severe" as to "rise to the level of persecution," id. at 200-01 (noting that determination of when economic sanctions are so severe as to constitute persecution is issue best "addressed on a case-by-case basis" (citing Guan Shan Liao v. U.S. Dep't of Justice, 293 F.3d 61, 67, 70 (2d Cir. 2002))).

Having explained its reasoning, the BIA summarized its response to the remand's legal query as follows:

> In sum, the question whether the birth of two children in China gives rise to a well-founded fear of persecution depends on the facts of each case, including, in particular, the details of local family planning policies, proof that an alien violated such policies, and evidence that local enforcement efforts against the violation will rise to the level of persecution. Evidence bearing on all of these factors must, taken together, establish that a reasonable person in the respondent's circumstances would fear persecution if he returned to his home country.

Id. at 201 (citing, inter alia, INS v. Cardoza-Fonseca, 480 U.S. 421 (1987)).

---

proving that the applicant could avoid persecution by relocating to another region [in] his or her country of nationality").

19

Applying these principles to Jian Hui Shao's claim, the BIA determined that the record did not permit reliable resolution of the first two steps of analysis. Evidence indicated that where, as in petitioner's case, a couple's first child is a girl, Chinese family planning policies sometimes permitted the couple to have a second child. Because Jian Hui Shao had failed to testify credibly as to the circumstances surrounding the birth of his second child, the agency could not determine whether he had ever sought such permission or whether local authorities would, in fact, have viewed his wife's second pregnancy as a violation of family-planning policies. See id. at 202.[6] Even if the "policy" and "violation" steps of analysis were

---

[6] In J-H-S-, the BIA noted that an alien's ability to satisfy the "violation" prong of analysis was "a prerequisite to a finding that there is a 'pattern or practice of persecution' of persons similarly situated to" the applicant. In re J-H-S-, 24 I. & N. Dec. at 202 n.4. Similarly, in J-W-S-, the BIA indicated that satisfaction of the "enforcement" prong of analysis was necessary to demonstrate a "pattern or practice of persecution." In re J-W-S-, 24 I. & N. Dec. at 190. Pattern-and-practice analysis affords a petitioner who cannot credibly demonstrate a reasonable possibility that he will be targeted as an individual for future persecution an alternative means to demonstrate that his fear of persecution is objectively reasonable. See 8 C.F.R. § 208.13(b)(2)(iii) (recognizing that applicant can meet burden for well-founded fear of persecution by demonstrating a reasonable possibility of persecution against himself as an individual or a pattern or practice of persecution against persons in a group to which he belongs). To the extent the BIA has indicated that a "pattern or practice" of persecution is one that is "systemic, pervasive, or organized," we have deemed that standard "a reasonable one" while at the same time seeking clarification from the BIA as to how the standard might be applied reliably to "particular instances." Mufied v. Mukasey, 508 F.3d 88, 92-93 (2d Cir. 2007) (internal quotation marks omitted) (remanding for clarification of how "systemic, pervasive, or organized" standard might apply to claims by Christians in Indonesia who feared future persecution). We understand the three-part analysis identified in the precedential decisions here at issue to provide satisfactory clarification of how a pattern or practice of persecution might reliably be identified in the

20

resolved in Jian Hui Shao's favor, however, the BIA concluded that his claim for relief failed at the final "enforcement" step of analysis because the record did not contain "persuasive evidence that this birth [of a second child] would trigger enforcement activity in Fujian Province" amounting to persecution.  Id.

In reaching this conclusion, the BIA pointed to State Department Country Profiles reporting on the unevenness and laxity of enforcement of the one-child policy both in Fujian Province and in China.[7]  Id. at 200, 202-03 (citing 1998 Profile at 21, 28; 2007 Profile ¶ 87). While acknowledging that, in the State Department's 2006 Country Report for China, reference was made to unattributed  "reports" of forced sterilization in Fujian Province, see id. at 200, 202 (citing 2006 Country Report § 1(f)), the BIA decided that such reports were insufficient to establish the objective reasonableness of Jian Hui Shao's professed fear of sterilization in light of evidence that the use of force was prohibited by Chinese law and State Department interviews with visa applicants from Fujian Province in 2006 "yielded 'no

_____

cases of Chinese nationals claiming a fear of future persecution based on their having two or more children, whether born in China or in the United States.

[7] In the challenged precedential opinions, the BIA specifically relied on various versions of two reports from the State Department's Bureau of Democracy, Human Rights and Labor:  one entitled China: Profile of Asylum Claims and Country Conditions (referred to herein as "Profile"), and the other entitled China Country Reports on Human Rights Practices (referred to herein as "Country Report").  To the extent that, at times, this opinion provides pinpoint citations to versions of these documents that differ from those found in the BIA opinions, this appears to be a result of printing pagination differences in versions of the same report before the court and the BIA.

evidence' of forced abortions." Id. at 203 (quoting 2007 Profile ¶ 99).[8]

Although the documents prompting remand in Shou Yung Guo v. Gonzales, 463 F.3d at 113, see supra at [14-15], had not been part of the record at Jian Hui Shao's removal proceedings, the BIA nevertheless considered the possibility that this evidence might support an "enforcement" finding favorable to petitioner at the third step of analysis. The BIA concluded that it did not because, although one document referenced mandatory sterilization in Changle City after the birth of a second child, nothing in the record indicated that the mandate was carried out through proscribed forced sterilization as opposed to China's "well-documented system of offering incentives to obtain compliance with birth control limits." In re J-H-S-, 24 I. & N. Dec. at 203 (noting that "[o]n balance, the evidence suggests that physical coercion to achieve compliance with family planning goals is uncommon and unsanctioned by China's national laws, and that the overall policy is much more heavily reliant on incentives and economically-based penalties"). The BIA thus concluded that, "[a]s a whole, the record lacks persuasive evidence to prove that the mere birth of two children in China would trigger family planning enforcement efforts that would rise to the level of persecution under the circumstances of this case." Id. Accordingly, it dismissed Jian Hui

---

[8] The 2007 Profile excerpt cited by the BIA acknowledges evidence presented to a congressional subcommittee in 1998 of "involuntary abortions and sterilizations" in Fujian Province. 2007 Profile ¶ 99. Nevertheless, the Profile notes that United States consular officials visiting Fujian more recently "did not find any cases of physical force employed in connection with abortion or sterilization." Id. In this context, the Profile observes that "[i]n interviews with visa applicants from Fujian, representing a wide cross-section of society, Consulate General Officers have found that many violators of the one-child policy paid fines but found no evidence of forced abortion or property confiscation." Id.

Shao's petition for relief from removal, ruling that he had failed to carry his burden to demonstrate a well-founded fear of persecution in China based simply on the birth of his two children in that country.

2.    Ji Wen Shi

On the same day that the BIA concluded that Jian Hui Shao was not entitled to relief from removal based on his having fathered two children in China, another BIA panel determined that Ji Wen Shi was not entitled to such relief based on the birth of his two children in the United States. Assuming the genuineness of Ji Wen Shi's subjective fear of forced sterilization if returned to China, the BIA indicated that the determinative question was whether petitioner had "met his burden of demonstrating an objectively reasonable fear of persecution." In re J-W-S-, 24 I. & N. Dec. at 188. Although the J-W-S- panel did not specifically reference the three-part analysis identified in J-H-S-, it appears to have concluded that Ji Wen Shi had carried his burden at the "policy" and "violation" steps and, thus, focused its attention almost exclusively on the question of whether petitioner had demonstrated a reasonable possibility of enforcement amounting to persecution on return to China.

In deciding this question, the BIA noted that both parties had submitted numerous documents on remand pertaining to China's national "one-child" policy and the delegation of the policy's enforcement from the national government to provincial and local authorities.[9]

---

[9] The BIA decision indicates that the record before the Board contained some forty documents deriving from a variety of sources: some personal to the petitioner; others

23

To the extent these documents included State Department <u>Country Reports</u> and <u>Profiles</u>, the

BIA took administrative notice of the more recent versions of these documents issued since

_____

produced by government authorities in the United States, China, and other countries; and still others reflecting academic and journalistic inquiry into China's family planning policies. <u>See</u> <u>In re J-W-S-</u>, 24 I. & N. Dec. at 186-88 nn.1-3. Among these were the documents from Fujian Province and Changle City prompting our remand in <u>Shou Yung Guo v. Gonzales</u>, 463 F.3d 109.

      Also noteworthy among the documents before the Board is a 248-page study, produced by Dr. Susan Greenhalgh, Professor of Anthropology at the University of California, Irvine, and Dr. Edwin A. Winckler, Research Associate of the East Asian Institute at Columbia University. Distributed by the INS Resource Information Center, this study offers a detailed discussion of the background to and evolution of China's family planning policies. <u>See</u> Susan Greenhalgh & Edwin A. Winckler, INS Res. Info. Ctr., <u>Perspective</u> <u>Series: Chinese State Birth Planning in the 1990s and Beyond</u> (Sept. 2001) ("2001 Greenhalgh & Winckler Study"). It outlines circumstances that have prompted particularly strict or flexible enforcement at different times, whether nationally or in various provinces of China. Significant to the petitions here at issue, the study includes a chapter devoted to Fujian Province. <u>Id.</u> at 127-61. Included therein is a subsection entitled "Rebellious Changle," which identifies various circumstances contributing to both that county's "culture of emigration" and its comparatively "lax enforcement" of family planning policies. <u>Id.</u> at 158-60 (internal quotation marks omitted). Although the study notes a lack of sufficient data to resolve "a main question implicit in INS concerns: is there any relationship between strong and weak birth program implementation and higher or lower levels of illegal international migration?," the authors offer observations that caution against categorical conclusions:

> First, if there is any connection, it is probably <u>not</u> between severity of enforcement and likelihood of illegal emigration. Birth planning is well enough (i.e., strictly enough) enforced in all counties to provide ample reason for emigration on the part of anyone determined to violate birth regulations. Second, if there <u>is</u> any relationship it may be not with enforcement that is strict but with enforcement that is routinely lax but periodically intensified through campaigns. Violating birth regulations and violating migration laws are both illegal behaviors that evidently flourish in certain independent-entrepreneurial places (like Changle county near Fuzhou City . . . ).

<u>Id.</u> at 145 (emphasis in original).

the parties' submissions. As in J-H-S-, the BIA determined that this record, viewed in its entirety, revealed "wide variation in the manner and strictness with which the 'one-child' policy is enforced in the various provinces." Id. at 189. Whether Ji Wen Shi's claimed fear of persecution was considered as to China generally or Fujian Province in particular, the panel concluded that the record did not indicate that such a fear was objectively reasonable.

Focusing first on whether the evidence demonstrated "that the Chinese Government has a national policy of requiring forced sterilization of parents who return with a second child born outside of China," the BIA concluded that it did not. Id. at 192. In so ruling, the BIA decided to accord greater weight to State Department reports than to the Aird affidavits referenced in the remand stipulation. While the Aird affidavits stated that Chinese nationals returning with more than one child could expect to face the same punishment as their countrymen who violated the one-child policy in China, the BIA observed that the affidavits and the attached documents on which they relied pointed to "no incidents of forced sterilization of parents who return to China with children born abroad." Id. at 190.[10] It deemed the omission significant because the State Department's China Profile for 2005 stated that American diplomats in China were unaware of any such sterilizations. See id. at 191 (citing 2005 Profile at 24).[11]

_____

[10] Indeed, no such evidence was adduced in any of the three cases that are the subject of this opinion.

[11] The BIA took administrative notice of the fact that no forced sterilizations were mentioned in a Canadian report discussing Chinese nationals removed from Canada. See id. at 191 & n.6 (citing Research Directorate, Immigration & Refugee Bd. of Can., China:

Even assuming identical penalties for population control violations occurring outside and within China, the BIA concluded that Ji Wen Shi had not convincingly demonstrated an objectively reasonable fear of forced sterilization. While noting that the 2006 Country Report stated that the "incentives and pressure" used to achieve compliance with China's family-planning policies "'sometimes left women with little practical choice but to undergo abortion or sterilization,'" id. at 190, the BIA declined to infer that the referenced pressure included "physical or mental coercion" because the "context" for the quoted observation was a discussion of various "economic" rewards and penalties, id. (emphasis in original).

The BIA acknowledged "isolated reports of forced sterilization in the documents of record." Id. at 190; see also id. at 193 n.8, 194 (citing 2002 Country Report § 1(f)); 2006 Country Report § 1(f)). Nevertheless, it determined that isolated reports were insufficient to "indicate that the applicant would be singled out for this treatment upon his return to China," nor did they demonstrate a "pattern or practice of persecution that would provide the applicant a basis for a well-founded fear of persecution in China on account of the birth of two children in the United States while he was outside of China for nearly 15 years." Id. at 190. Rather, the BIA concluded that the enforcement action that a returning Chinese national might reasonably fear in such circumstances consisted of economic fines and penalties. See

Penalties Faced by Couples Returning from Overseas who are in Violation of Family Planning Regulations (2001-2005) (Aug. 25, 2005)). Ji Wen Shi does not object to the BIA's consideration of this document in his due process challenge to the BIA's having taken notice of the State Department's 2007 Profile, see infra at **[52-57]**.

26

id. at 191 (and evidence cited therein).

Noting that Ji Wen Shi had not argued that he faced stricter enforcement action in his native Fujian Province, the BIA nevertheless considered that possibility in light of evidence pertaining to that province and particularly to Changle City. The BIA focused first on two documents that were also included in the record in Shou Yung Guo: the 2003 Changle City Administrative Opinion and the 2003 Fujian Province Administrative Decision.[12] These documents indicated that Chinese citizens who violated their country's population limits abroad were subject to the same punishments as citizens whose violations occurred in China. Nevertheless, the BIA observed that "[n]either document refer[red] to sterilization, much less forced sterilization," as a possible punishment. Id. at 192. To the extent petitioner urged such an inference from an additional Changle City document, referencing mandated sterilization after the birth of a second child, see Changle City Family Planning Policy Leading Team, Opinions in Administering the Family Planning Subjects with Early Marriage and Out of Plan Pregnancy (June 27, 1995) ("1995 Changle City Opinion"), the BIA was not persuaded because "central government policy prohibits physical coercion to compel persons to submit to family planning enforcement," id. at 193, and no evidence had been adduced indicating that Changle City officials nevertheless "implemented" the sterilization mandate "through physical force or other means that would amount to persecution," id. at 192.

As in J-H-S-, the BIA cited to State Department reports indicating that family-

---

[12] As the BIA noted, these documents were submitted in Ji Wen Shi's case as attachments to one of the Aird affidavits. See In re J-W-S-, 24 I. & N. Dec. at 192.

planning enforcement in Fujian Province was generally "lax" and "uneven," id. at 193, at the same time that it acknowledged the Country Reports' references to "reports" of forced sterilization of women in Fujian Province, id. at 193 n.8, 194 (citing 2002 Country Report § 1(f); 2006 Country Report § 1(f)). Again, the BIA accorded the unspecified reports little weight in light of other evidence indicating that visa applicants from Fujian Province in 2006 had made no mention of forcible abortions and that economic penalties were the general means of enforcement. See id. at 194.

Finding that the evidence "[a]t most . . . suggests that the applicant and his wife may face 'sanctions and penalties' upon returning to China because of the births of their United States citizen children" not "ris[ing] to the level of persecution," the BIA determined that Ji Wen Shi had not persuasively demonstrated that his fear of forced sterilization was objectively reasonable. Id. Accordingly, the BIA ruled that Ji Wen Shi had failed to carry his burden of proof in seeking relief from removal.

### 3. Show Yung Guo

On August 2, 2007, two months after its decisions in J-H-S- and J-W-S-, the BIA issued its precedential opinion declining to reopen Show Yung Guo's removal proceedings. See In re S-Y-G-, 24 I. & N. Dec. 247.[13] In so ruling, the BIA considered not only the three documents referenced in this court's remand order, but additional materials submitted by the parties. See id. at 248-49 n.1 (identifying documents). The BIA further considered Guo's

---

[13] The same three board members who decided J-H-S- also decided S-Y-G-, with both decisions authored by Board Member David B. Holmes.

28

argument urging reopening pending resolution of an asylee relative petition filed on her behalf by her husband.

Adapting the evidentiary framework articulated in In re J-H-S- to a motion to reopen based on changed country conditions, the BIA stated that an alien "may successfully reopen his or her asylum case if, on a case-by-case analysis, the genuine, authentic, and objectively reasonable evidence proves that (1) a relevant change in country conditions occurred, (2) the applicant has violated family planning policy as established in that alien's local province, municipality, or other relevant area, and (3) the violation would be punished in a way that would give rise to a well-founded fear of persecution." Id. at 251 (footnote omitted) (citing In re J-H-S-, 24 I. & N. Dec. 196). Mindful that Show Yung Guo's failure to appeal the 1997 BIA dismissal of her asylum claim meant that "the Immigration Judge's credibility determination remain[ed] the law of the case," id. at 250, the BIA construed the remand issue as limited to the following question: had Show Yung Guo "produced enough evidence to show changed country conditions in China evidencing both that her two children (a son born in 1988 in China and a daughter born in 1995 in the United States) would be viewed as exceeding birth control limits in her local province, and that the sanctions applicable for such a violation would rise to the level of persecution." Id. at 251.

Preliminary to reviewing the record evidence relevant to this question, the BIA noted (1) the law's general inclination to view motions to reopen with disfavor, see id. at 252 (citing INS v. Doherty, 502 U.S. 314, 323 (1992)); (2) the Board's "broad discretion over

29

motions to reopen," id.; (3) its disinclination to exercise that discretion favorably in the case of an alien, such as petitioner, "who was previously found to have offered incredible testimony to gain immigration benefits," id. at 251; and (4) the movant's burden, in any event, to "'establish prima facie eligibility for asylum, i.e., a realistic chance that [s]he will be able to establish eligibility,'" id. (alteration in original) (internal quotation marks omitted) (quoting Poradisova v. Gonzales, 420 F.3d 70, 78 (2d Cir. 2005)).

Focusing on the last point, the BIA concluded that the Changle City and Fujian Province documents relating to Zheng Yu He did not convincingly demonstrate that Fujian authorities would view the birth of Show Yung Guo's second child in the United States as a violation of Chinese law. First, there was a longer interval between the births of Show Yung Guo's children ("more than 7 years") than between the births of Zheng Yu He's children (5½ years), a potentially relevant factor because "provincial law indicates that married couples may apply to have a second child within certain time frames that are being increasingly relaxed." Id. at 256 (citing 2005 Profile at 21). Further, the sanctions referenced in the Changle City and Fujian Province documents were to be levied pursuant to a directive governing penalties for those who, like Zheng Yu He, were government employees and Communist Party members. Show Yung Guo did not claim to be either. See id.

Even if these documents had allowed Show Yung Guo to carry her burden at the violation step of analysis, the BIA concluded that they did not provide "any basis" for

petitioner "fearing sanctions that would rise to the level of persecution." Id. To the extent these documents referenced "sanctions" generally, the BIA determined that the word was reasonably understood to refer to prescribed "economic ones, as descriptions of those types of sanctions abound in published reports," rather than to proscribed forcible ones. Id. (noting that in J-H-S- and J-W-S-, the BIA had referenced State Department reports describing sanctions "as involving job loss and demotion, loss of promotions, expulsion from the Communist Party and attendant loss of employment, and destruction of property").

The BIA reached the same conclusion with respect to the Fujian Province Q & A Handbook.[14] The BIA was not convinced that the document's reference to mandatory sterilizations on the birth of a second child reflected any change in policy. See id. at 257. In addition, the BIA observed that the Q & A Handbook gave no indication "that forcible sterilizations are mandated in Fujian Province after the birth of a second child." Id. (emphasis in original). The BIA viewed the "distinction" as "key" because, "under the relevant portions of the Act, refugee protection extends only to instances of 'forced' abortions or sterilizations," id. (citing 8 U.S.C. § 1101(a)(42)), and "documentation on family planning enforcement indicates that efforts are aimed primarily at encouraging compliance with birth limits through incentives, education, and other [non-forcible] methods," id. (citing Population and Family Planning Law (P.R.C.) (promulgated by the Standing Comm. Nat'l

_____

[14] On remand, the BIA considered both the 1999 and 2005 versions of the Handbook, noting that the later document did "not reflect any change in substance" on the point at issue. See In re S-Y-G-, 24 I. & N. Dec. at 257 n.8.

People's Cong., Dec. 29, 2001, effective Sept. 1, 2002), reprinted in 2005 Profile app. A at 38-46).

As in J-H-S- and J-W-S-, the BIA acknowledged unattributed reports of occasional forced sterilizations. It concluded that "the mere mention of such incidents, without details as to when, where, and how often this occurred, does not, on this record, indicate that it is widespread enough to find that the applicant has met her burden of submitting sufficient evidence to warrant reopening of the proceedings." Id. at 256.

## II.    Discussion

### A.    Resolving Petitioners' Arguments by Reference to Their Asylum Claims

Before discussing the various challenges petitioners raise to the BIA's precedential decisions in their cases, we note that petitioners frame those arguments, in the first instance, by reference to their claims for asylum. This makes sense because to secure asylum, petitioners need demonstrate only that their professed fear of future persecution in China in the form of forced sterilization is "well founded," see 8 U.S.C. § 1101(a)(42), a lighter burden of proof than showing that such persecution is "more likely than not," the standard necessary to secure withholding of removal or CAT relief. See INS v. Cardoza-Fonseca, 480 U.S. at 440;[15] accord Yi Long Yang v. Gonzales, 478 F.3d 133, 141 (2d Cir. 2007); see also

_____

[15] In Cardoza-Fonseca, the Supreme Court indicated that the "well-founded fear" standard might be construed to "indicate 'that so long as an objective situation is established by the evidence, it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a reasonable possibility.'" 480 U.S. at 440 (quoting INS v. Stevic, 467 U.S. 407, 424-25 (1984)). This "reasonable possibility" criteria is now incorporated in 8 C.F.R. § 1208.13(b)(2)(i) (stating that "applicant has a well-founded fear

32

8 C.F.R. § 208.16(b)(2) (providing that alien seeking withholding of removal must establish that it is more likely than not that his life or freedom would be threatened in his country of origin on one of specified protected grounds); id. § 208.16(c)(2) (requiring alien seeking CAT relief to show it is more likely than not that he would be tortured on removal). Thus, if the BIA properly concluded that petitioners each failed to demonstrate a well-founded fear of future persecution, it follows that they cannot carry the heavier burden necessary to secure withholding of removal or CAT relief. Because we identify no error in the BIA's asylum ruling, we need not discuss these other forms of relief from removal.

B.    The Unchallenged Issue of Statutory Interpretation

To secure asylum, an alien must demonstrate that he qualifies as a "refugee" within the meaning of the INA because he has suffered past persecution on account of "race, religion, nationality, membership in a particular social group, or political opinion," or that he has a well-founded fear of future persecution on such grounds. 8 U.S.C. § 1101(a)(42). Government-ordered forced abortions or sterilizations are statutorily recognized as political persecution. See id.

On these petitions for review, no party challenges the BIA's decision to construe 8 U.S.C. § 1101(a)(42) to recognize the possibility that, on a case-by-case analysis, some Chinese nationals with two or more children might be able to demonstrate a well-founded fear of future forced sterilization based on general population control policies without any

of persecution if . . . (B) There is a reasonable possibility of suffering . . . persecution" on account of a protected ground on removal to native country).

33

evidence of past persecution or threats of persecution to themselves as individuals. Having ourselves identified ambiguity in the statutory language as it might apply in such circumstances, see Jian Hui Shao v. BIA, 465 F.3d at 501-02, we now accord Chevron deference to the BIA's statutory construction, which rejects a categorical application of the "well-founded fear" provision to such claims in favor of case-by-case review. See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837.

The BIA's construction finds support in INS v. Cardozo-Fonseca, 480 U.S. 421. In that case, the Supreme Court indicated that a "reasonable possibility" of persecution could be sufficient to support a well-founded fear, see id. at 440, and cited approvingly to a one-in-ten example of persecution to illustrate the sort of "reasonable possibility" that would demonstrate a "well-founded fear," see id. ("'Let us . . . presume that it is known that in the applicant's country of origin every tenth adult male person is either put to death or sent to some remote labor camp. . . . In such a case it would be only too apparent that anyone who has managed to escape from the country in question will have a "well-founded fear of being persecuted" upon his eventual return.'" (quoting 1 A. Grahl-Madsen, The Status of Refugees in International Law 180 (1966))).[16] At the same time, however, the Court declined to

---

[16] This court cited to this part of Cardoza-Fonseca to support the observation that a "slight" chance of persecution may support a well-founded fear. Diallo v. INS, 232 F.3d 279, 284 (2d Cir. 2000). Since then, we have made clear that even a slight chance must be "discernible," id., by reference to "solid" evidence, Jian Xing Huang v. INS, 421 F.3d at 129. Thus, to demonstrate the reasonable possibility of persecution necessary to a well-founded fear, a claimant must present "reliable, specific, objective supporting evidence." Ramsameachire v. Ashcroft, 357 F.3d at 178 (internal quotation marks omitted); accord Yi Long Yang v. Gonzales, 478 F.3d at 140-41.

attempt any further interpretation of the well-founded fear standard, observing that "[t]here is obviously some ambiguity in a term like 'well-founded fear' which can only be given concrete meaning through a process of case-by-case adjudication." Id. at 448 (citing Chevron in noting that, as to "any gap left, implicitly or explicitly, by Congress, the courts must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program" (internal quotation marks omitted)).

Accordingly, we accept the BIA's decision to apply case-by-case review to Chinese nationals' claimed fears of future persecution based on the births of two or more children, and we review in turn its conclusion that none of the three petitioners in these cases convincingly demonstrated that their professed fears were well founded.

C.    The Challenged Conclusions that No Petitioner Demonstrated an Objectively Reasonable Fear of Future Persecution

Each petitioner argues that the BIA erred in concluding that he or she had failed to demonstrate an objectively reasonable fear of future forced sterilization if removed to China. To the extent petitioners challenge the Board's assessment of competing evidence and its ultimate findings of fact, our review is necessarily deferential. "[W]e will not disturb a factual finding if it is supported by 'reasonable, substantial, and probative' evidence in the record when considered as a whole." Wu Biao Chen v. INS, 344 F.3d 272, 275 (2d Cir. 2003) (quoting Diallo v. INS, 232 F.3d 279, 287 (2d Cir. 2000)); accord Manzur v. U.S. Dep't of Homeland Sec., 494 F.3d 281, 289 (2d Cir. 2007). Indeed, Congress has specified that "administrative findings of fact are conclusive unless any reasonable adjudicator would

35

be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Thus, when a petitioner bears the burden of proof, his failure to adduce evidence can itself constitute the "substantial evidence" necessary to support the agency's challenged decision. See generally Zhou Yun Zhang v. INS, 386 F.3d 66, 78-79 (2d Cir. 2004) (holding that adverse credibility determination by itself can "constitute substantial evidence to support the conclusion that [the petitioner] failed to carry his burden of proof on his persecution claim," in absence of other corroborative evidence), overruled in part on other grounds by Shi Liang Lin v. U.S. Dep't of Justice, 494 F.3d 296 (2d Cir. 2007) (en banc). Moreover, when a petitioner challenges "the factual findings underlying the immigration court's determination that [the petitioner] has failed to satisfy his burden of proof" on the issue of past persecution or a well-founded fear of future persecution, we will not disturb the BIA's ruling unless we conclude that "no reasonable fact-finder could have failed to find" in favor of petitioner. Wu Biao Chen v. INS, 344 F.3d at 275 (internal quotation marks omitted). That conclusion is not warranted in any of the three cases at issue.

1.    Jian Hui Shao

In petitioning this court for review of the BIA's precedential decision in his case, Jian Hui Shao challenges neither the agency's response to the statutory interpretation question posed on remand by this court, nor the three-step evidentiary framework identified by the BIA as useful to determining when a claimed fear of future sterilization on removal to China

36

is well founded.[17] Further, petitioner raises no objection to the BIA (as opposed to an IJ) weighing the record evidence or making factual determinations in his case.[18] Instead, the singular focus of Jian Hui Shao's petition is factual. Petitioner argues that the BIA erred in finding that he failed to demonstrate persuasively that (1) his second child's birth would be viewed as a violation of family planning regulations in Fujian Province, see Jian Hui Shao Br. at 1, and (2) he "would face a reasonable possibility of persecution if removed," id. at 8. Because we conclude that substantial evidence supports the BIA's findings and that the record does not compel contrary determinations, we reject Jian Hui Shao's challenge as without merit.

      a.      Petitioner's Failure to Adduce Credible Evidence as to the Circumstances of His Wife's Second Pregnancy Supports the BIA's Finding that He Failed to Carry His Burden at the Violation Step of Analysis

Petitioner submits that, at the violation step of analysis, the BIA erred in noting record evidence of various exceptions to China's one-child policy without making further inquiry to determine if Jian Hui Shao qualified for any of these exceptions. We are not persuaded. The argument ignores the very point made by the BIA: the burden was on Jian Hui Shao to demonstrate that Chinese officials would view his wife's second pregnancy after the birth of their first daughter as a violation of family planning policy. Record evidence showed that

---

[17] To the extent Show Yung Guo raises such a challenge in the context of her motion to reopen, we explain infra at **[60-61]** why we reject the argument on its merits.

[18] Although Ji Wen Shi presses such a challenge, for reasons stated infra at **[44-46]**, we conclude that the argument has not been preserved.

second pregnancies might be authorized in Fujian Province when a couple's first child was a girl. See In re J-H-S-, 24 I. & N. Dec. at 198-99, 202 (citing 2005 Country Report § 1(f), 2005 Profile at 49, and 1998 Profile at 25). Because Jian Hui Shao had failed to testify credibly as to the circumstances surrounding his wife's second pregnancy, the BIA could not reliably determine whether petitioner had sought or been granted such authorization, a fact relevant to determining whether government officials would view the birth of his second daughter as a violation of Chinese family planning policies. Where a petitioner thus fails to adduce "reliable, specific, objective" evidence establishing the "context and believability" of his claimed fear of persecution, we can hardly conclude that the BIA was compelled to resolve the point in his favor. Ramsameachire v. Ashcroft, 357 F.3d at 178; accord Yi Long Yang v. Gonzalez, 478 F.3d at 140-41; see also Jian Xing Huang v. INS, 421 F.3d at 128-29 (holding that BIA did not err in finding that petitioner failed to carry burden of demonstrating well-founded fear of forced sterilization on removal to China based on births of two children in United States, the first being a girl, because in Fujian Province, "a second child is often permitted if the first child is a girl" and "there is no indication that [petitioner] would be subject to forced sterilization for having a second child").

    b.    At the Enforcement Step of Analysis, Substantial Evidence Supports the BIA's Finding that Petitioner Failed to Demonstrate a Reasonable Possibility of Forced Sterilization on Removal to China

At the enforcement step of analysis, Jian Hui Shao faults the BIA's finding that he failed to demonstrate a reasonable possibility of forced sterilization on removal to China.

38

We disagree. The BIA acknowledged the evidence most favorable to petitioner on the issue of enforcement, specifically, statements in the 2006 Country Report (a) indicating that methods for enforcing China's birth limits "sometimes left women with little practical choice but to undergo abortion or sterilization," In re J-H-S-, 24 I. & N. Dec. at 200, and (b) acknowledging "reports" of some women's "forced sterilization," id. at 202; see 2006 Country Report § 1(f). It proceeded to explain by reference to substantial record evidence why it was not persuaded that Jian Hui Shao faced a reasonable possibility of such persecution if removed to China. The record does not compel a contrary conclusion.

The BIA explained that it declined to infer a reasonable possibility of petitioner's forced sterilization from the above-quoted first statement because its "context" was a discussion of the various economic rewards and penalties used by Chinese authorities to secure compliance with population limits. Id. at 200. The BIA observed that its construction of the statement found further support in the State Department's 2007 Profile for China,[19] which, while acknowledging that "'public and other pressure' is used in Fujian Province to encourage compliance with birth planning laws," specifically noted that American officials in the province "'did not find any cases of physical force employed in connection with abortion or sterilization.'" Id. (quoting 2007 Profile ¶ 99).

In declining to infer a reasonable possibility of petitioner's forced sterilization from

---

[19] We discuss infra at [52-57] Ji Wen Shi's objection to the BIA taking judicial notice of the 2007 Profile in his case. Because Jian Hui Shao and Show Yung Guo raised no such objection in their petitions, we deem the argument waived as to these petitioners.

unspecified "reports" of such occasional abuse, the BIA relied on evidence in State Department reports indicating that (1) the use of physical coercion to enforce family planning policies was, in fact, officially proscribed in China, id. at 202; see 2007 Profile ¶ 91; (2) the enforcement of family planning policies in Fujian Province was generally "lax" and "uneven," In re J-H-S-, 24 I. & N. Dec. at 202 (quoting 1998 Profile at 21, 26); and (3) 2006 visa applications from Fujian Province "yielded 'no evidence' of forced abortions," see id. at 203 (quoting 2007 Profile ¶ 99). In Jian Xing Huang v. INS, we ruled that the BIA was "entitled to rely" on State Department reports of country conditions provided it "did not overlook any contradictory evidence directly presented by the petitioner." 421 F.3d at 129. While Jian Hui Shao does not charge the BIA with overlooking any relevant evidence, he nevertheless raises various challenges to the weight the Board assigned the competing evidence.

First, he asserts that the BIA could not rely on omissions in the visa applications without explaining why these documents constituted probative evidence on the issue of forced sterilization. The point is without merit, particularly in light of the government's unchallenged assertion that, because visa applicants are asked to state all grounds on which they seek entry into the United States, it would be reasonable to expect that, if forcible means — abortions or sterilization — were being used by local authorities to enforce family planning policies, applicants for legal entry into the United States would have as much of an incentive to report such acts of persecution, or their fear thereof, as Chinese nationals who

40

entered this country illegally. Presented with unattributed "reports" of forced sterilization that lacked any specificity as to number or circumstance, the BIA acted well within its fact-finding discretion in considering whether any other evidence, including visa applications, shed light on the reasonable possibility of petitioner facing such persecution on removal to China. To the extent other evidence failed to support that possibility, the BIA reasonably determined that the unattributed "reports" did not, by themselves, persuasively demonstrate a reasonable possibility that Jian Hui Shao would face such future persecution. See Ramsameachire v. Ashcroft, 357 F.3d at 178 (noting need for "reliable, specific, objective" evidence to demonstrate objectively reasonable fear of future persecution) (internal quotation marks omitted); accord Yi Long Yang v. Gonzalez, 478 F.3d at 140-41; see also Jian Xing Huang v. INS, 421 F.3d at 129 (emphasizing need for "solid" evidence to demonstrate that professed fear of persecution was objectively reasonable and not merely "speculative"). We cannot conclude that the reports compelled a contrary finding.[20]

Jian Hui Shao's second argument faults the BIA for relying on an outdated statement

---

[20] To the extent the victims of the reported forced sterilizations were women, see 2006 Country Report § 1(f), we note that Jian Hui Shao offered no evidence of reported forced sterilizations of men. See generally 2001 Greenhalgh & Winckler Study at 99-100, tbl.6.2 (noting irony that "so many of the asylum applicants claiming persecution under the one-child policy are male," while physical burdens associated with policy compliance — abortions and the vast majority of sterilizations — are borne by women). Indeed, at oral argument, petitioner's counsel admitted that Jian Hui Shao's wife, presumably as likely a target for forced sterilization as petitioner, was not sterilized after the birth of the couple's second child. Recognizing that the fact undermined the objective reasonableness of Jian Hui Shao's claim that his fear of sterilization was well founded, counsel asserted that petitioner's wife (with two children) had managed to live in hiding from government authorities since her husband's 2002 departure from China.

41

in the 1998 Profile to support a conclusion that Fujian Province's enforcement procedures are generally "lax" and "uneven." The point merits little discussion because the BIA also cited the 2007 Profile, which reiterates the "uneven" enforcement characterization. See 2007 Profile ¶ 87. In any event, Jian Hui Shao points to no contrary evidence, much less evidence of forced sterilizations to persons similarly situated to himself.

Finally, Jian Hui Shao submits that the BIA erred in assessing his fear of forced sterilization by reference only to possible physical coercion without considering the possibility that "[s]evere economic pressures" might be applied to the same effect. Jian Hui Shao Br. at 9-10. The argument mischaracterizes the BIA's decision, which explicitly acknowledges that severe economic penalties might serve as a basis for a well-founded fear of future persecution, but finds no evidence of penalties rising to that level. See In re J-H-S-, 24 I. & N. Dec. at 200 (noting that "[e]nforcement efforts resulting in moderate economic impact would not, in general, prove a well-founded fear of future persecution").[21] To the extent Jian Hui Shao points us to the 2006 Country Report as evidence that China has used economic penalties to put "pressures on couples with two or more children" that have "often 'left [them] with little practical choice but to undergo abortion or sterilization,'" Jian Hui

---

[21] In a recent precedential decision, the BIA ruled that economic penalties qualified as persecution if the harm exacted "severe economic disadvantage," In re T-Z-, 24 I. & N. Dec. 163, 173 (B.I.A. 2007) (internal quotation marks omitted), but noted that "[g]overnment sanctions that reduce an [alien] to an impoverished existence," such as a "particularly onerous fine, a large-scale confiscation of property, or a sweeping limitation of opportunities to continue to work in an established profession or business," may "amount to persecution even if the victim retains the ability to afford the bare essentials of life," id. at 174.

Shao Br. at 10 (alteration in original) (quoting 2006 Country Report § 1(f)), we are not persuaded that this statement constituted "reliable, specific, objective" evidence compelling the well-founded fear finding urged by petitioner, Ramsameachire v. Ashcroft, 357 F.3d at 178.

First, the statement, as it appears in the Country Report, identifies "women," not "couples," as the persons who face the noted practical dilemma. 2006 Country Report § 1(f).[22] Second, the Country Report states that the problem arises "sometimes." Id. Jian Hui Shao offered no evidence indicating that "sometimes" arose with sufficient frequency to establish a reasonable possibility of economic pressures being used to compel his sterilization on return to China. See INS v. Cardoza-Fonseca, 480 U.S. at 431.[23] Finally, to the extent it is "forced" sterilizations that are recognized as a form of political persecution, 8 U.S.C. § 1101(a)(42), it is hardly apparent that the "pressures" giving rise to the reported dilemma would force persons generally, or Jian Hui Shao in particular, to submit to sterilization. See 2006 Country Report § 1(f) (detailing penalties "such as job loss or demotion, loss of promotion opportunity, expulsion from the party (membership in which

---

[22] As noted supra note 20, petitioner has not alleged that physical or economic means were used to compel his wife to submit to sterilization as a result of the birth of a second child.

[23] Certainly, none of the petitioners in these three cases attempted to demonstrate that their fears were well founded by pointing to any evidence of the statistical frequency with which forced abortions occurred in relevant areas. Cf. INS v. Cardoza-Fonseca, 480 U.S. at 431 (citing approvingly to one-in-ten frequency as sufficient support for well-founded fear).

43

was an unofficial requirement for certain jobs), and other administrative punishments, including in some cases the destruction of property"). Thus, assuming that, in some cases, severe economic penalties could be as effective as physical pressure in forcing an involuntary sterilization, we cannot conclude that the record evidence in this case compelled the BIA to find a reasonable possibility that Jian Hui Shao would face such severe economic compulsion upon his removal to China.

Because we identify no merit in Jian Hui Shao's claims of fact-finding error by the BIA, we deny his petition for review.

2.    <u>Ji Wen Shi</u>

a.    <u>Petitioner's Challenge to the BIA's *De Novo* Review of the Factual Record Is Either Without Merit or Unpreserved for Review</u>

Before challenging the BIA's factual determination that he failed to demonstrate a well-founded fear of forced sterilization in China, Ji Wen Shi asserts that the BIA committed legal error by examining the record evidence <u>de novo</u> after the IJ had made findings in his favor. <u>See</u> <u>Fen Yong Chen v. BCIS</u>, 470 F.3d 509, 513-14 (2d Cir. 2006) (observing that BIA is not permitted to engage in <u>de novo</u> review of an IJ's factual findings); 8 C.F.R. § 1003.1(d)(3)(iv) (stating that BIA will not engage in fact-finding, "[e]xcept for taking administrative notice of commonly known facts such as current events or the contents of official documents"); <u>id.</u> § 1003.1(d)(3)(i) (stating that BIA will review IJ findings of fact only to determine clear error). We disagree.

44

First, we observe that the BIA did not conduct de novo review of the IJ's critical finding of fact, i.e., that Ji Wen Shi had testified credibly to a fear of forced sterilization on removal to China. Rather, on initial appeal from the grant of relief in favor of Ji Wen Shi, the BIA made a legal determination that, while such credible testimony was sufficient to demonstrate a genuine subjective fear of future persecution, more was needed to demonstrate the objective reasonableness of that fear. This comports with our decision in Ramsameachire v. Ashcroft, which states that the subjective element of a well-founded fear claim "is established via the applicant's credible testimony that his fear is genuine; while the [objective element] is largely dependent upon the context and believability he can establish for his claims through presentation of reliable, specific, objective supporting evidence." 357 F.3d at 178 (internal quotation marks omitted).

Second, to the extent the BIA itself reviewed evidence and made factual findings on the element of objective reasonableness, it did so with the apparent consent of the parties. On the initial appeal, Ji Wen Shi submitted no fewer than nineteen additional documents for BIA consideration, see In re J-W-S-, 24 I. & N. Dec. at 187 n.2 (listing documents submitted on initial appeal), never questioning the BIA's authority to review this evidence or asking for a remand to allow the IJ to conduct any review in the first instance. Further, in the stipulation for remand from this court, Ji Wen Shi agreed to the BIA's consideration of still further evidence to be submitted by the government. See id. at 188 n.4 (identifying documents submitted on remand). Once again, petitioner raised no objection to the BIA's

45

review of these documents or any of the other record evidence; nor did he urge remand to the IJ for further fact-finding.

Under these circumstances, we conclude that Ji Wen Shi failed to preserve for our review any objection he might have had to the BIA's de novo review of the evidence and determination of the objective reasonableness element of his well-founded fear claim. See Shunfu Li v. Mukasey, 529 F.3d 141, 146-47 (2d Cir. 2008).

> b. Substantial Evidence Supports the BIA's Determination that Petitioner Failed to Demonstrate a Reasonable Possibility that He Would Face Forced Sterilization in China
>
> (1) Charged Legal Error in the Consideration of National Policies

In assessing the objective reasonableness of Ji Wen Shi's professed fear of forced sterilization, the BIA appears to have assumed that, at the "policy" and "violation" prongs of analysis, petitioner established that Chinese authorities would view the birth of his two sons in the United States as a violation of population control policies. Thus, its review of the evidence was limited to the issue of enforcement, considering whether Ji Wen Shi had adduced a reasonable possibility of forced sterilization on removal to China under either national or local enforcement policies.

On his petition for review to this court, Ji Wen Shi devotes considerable energy to challenging the BIA's consideration of national enforcement policies, arguing that the BIA thus heightened his burden of proof and discounted the relevancy of evidence pertaining to local enforcement. See Ji Wen Shi Br. at 23. The argument misconstrues the BIA's actions.

46

As the BIA observed, Ji Wen Shi presented a "generalized argument" that he faced a reasonable possibility of persecution on return to China. In re J-W-S-, 24 I & N. Dec. at 189. He did not argue that enforcement policies in his native province of Fujian were more likely to expose him to this possibility than policies generally applicable throughout China. See id. Thus, although the BIA had that same day determined that the enforcement prong of a well-founded fear analysis would generally focus on local policies, see In re J-H-S-, 24 I. & N. Dec. at 199-200, in Ji Wen Shi's case, the BIA afforded petitioner the opportunity to demonstrate a reasonable possibility of forced sterilization through evidence of either national or local enforcement policies. We identify no legal error in such analysis and no prejudice to Ji Wen Shi's ability to demonstrate a reasonable possibility of enforcement amounting to persecution at the local level.

### (2)    Findings as to National Enforcement Policies

Although Ji Wen Shi faults the BIA for assessing the objective reasonableness of his claimed fear of sterilization by reference to national enforcement policies, his general challenge to the BIA's factual findings might well be understood to extend to this part of the agency's analysis no less than to that pertaining to local enforcement policies.

We conclude that substantial evidence supports the BIA's finding that Ji Wen Shi had not convincingly demonstrated a reasonable possibility of forced sterilization based on national enforcement policies. First, to the extent the Aird affidavits indicated that Chinese nationals who had violated their country's family planning regulations abroad could expect

47

to face the same punishments on removal as their countrymen whose violations had occurred in China, the BIA acted within its discretion in declining to infer therefrom a reasonable possibility that Ji Wen Shi faced forced sterilization. As the BIA noted, nothing in the affidavits or their supporting attachments referenced any occurrences of forced sterilization. See In re J-W-S-, 24 I. & N. Dec. at 189-90.[24] We cannot conclude that a contrary finding was compelled in light of our own determination that the Aird Affidavits are "inadequate to establish the existence of an official policy of forced sterilization . . . and thus insufficient to show that the applicants were likely to face forced sterilization if returned to China." Jin Xiu Chen v. U.S. Dep't of Justice, 468 F.3d 109, 110 (2d Cir. 2006); see Wei Guang Wang v. BIA, 437 F.3d 270, 274-76 (2d Cir. 2006).

Second, as in J-H-S-, the BIA acknowledged that the 2006 Country Report indicated that enforcement policies "sometimes left women with little practical choice but to undergo abortion or sterilization." In re J-W-S-, 24 I. & N. Dec. at 190. Here again, however, the BIA reasonably relied on the context of the statements to find that the dilemma was being ascribed to a system of economic rewards and moderate economic penalties that did not

---

[24] For example, the Aird affidavits refer to a 1988 incident in which a Chinese couple living abroad was reportedly told by family planning officials that they were not authorized to have a second child. The threatened punishment for a violation, however, was not forced sterilization but a ban on plans to expand the couple's factory in China and unspecified punishment to their workforce. See In re J-W-S-, 24 I. & N. Dec. at 189.

To the extent the Aird affidavits also rely on the 2003 Changle City Administrative Opinion and 2003 Fujian Province Administrative Decision referenced in Shou Yung Guo v. Gonzales, 463 F.3d at 112-13, we discuss that evidence infra at **[61-65]** in addressing the BIA's findings with respect to local enforcement.

48

necessarily amount to "physical or mental coercion."[25]  Id. (emphasis in original).  While Ji Wen Shi disputes this assessment of the evidence, he does so only through conclusory arguments, pointing to no reliable, specific, and objective evidence that would have compelled the BIA to infer from the quoted language in the 2006 Country Report that there was a reasonable possibility that petitioner would be "forced" — physically or otherwise — to submit to sterilization on removal to China.  See Ramsameachire v. Ashcroft, 357 F.3d at 178; accord Yi Long Yang v. Gonzales, 478 F.3d at 140-41.  In fact, for reasons already detailed in discussing a related argument by Jian Hui Shao, we conclude that substantial evidence supports the BIA's contrary finding.  See supra at **[38-44]**.

Third, the BIA further supported its factual findings by reference to a State Department report indicating that American diplomats in China were unaware of "'any cases in which returnees from the United States were forced to undergo sterilization procedures on their return.'"  In re J-W-S-, 24 I. & N. Dec. at 191 (quoting 2005 Profile at 28).[26]  The

---

[25] Although Ji Wen Shi asserts that the BIA erred in failing to consider whether "a significant economic hardship would result" due to his failure to comply with family planning policies, see Ji Wen Shi Br. at 25, it is evident that the BIA did explicitly consider that possibility but concluded, consistent with its decision in In re T-Z-, 24 I. & N. Dec. 163, and its conclusion in In re J-H-S-, 24 I. & N. Dec. at 200, that at most Ji Wen Shi would face "moderate economic impact" not amounting to persecution, In re J-W-S-, 24 I. & N. Dec. at 191.

[26] Although the BIA also noted that the 2007 Profile indicated that national policy did not provide for children born overseas to be counted for birth planning purposes when the parents return to China, see In re J-W-S-, 24 I. & N. Dec. at 190 (citing 2007 Profile ¶¶ 111-12), it subsequently discussed the possibility that the Fujian Province and Changle City documents indicated a different local practice.  We discuss the BIA's findings in that regard infra at **[50-52]**.

significance of the report is highlighted by the fact that, despite the voluminous documentary records developed in these three cases, none of the petitioners points us to evidence of any person being forcibly sterilized on removal to China based on having two children.

In sum, because substantial evidence supports the BIA's finding that no national enforcement policy gives rise to a reasonable possibility that Ji Wen Shi would be forcibly sterilized on removal to China, we cannot conclude that the BIA was compelled to find a well-founded fear of such persecution.

(3)     Findings as to Local Enforcement Policies

The same conclusion applies with respect to evidence of local enforcement policies. While official documents from Fujian Province and Changle City indicate that Chinese nationals who violate birth limits while abroad will be subject to the same punishment as citizens whose violations occur in China, the BIA reasonably observed that these documents made no "refer[ence] to sterilization, much less forced sterilization," as a possible punishment. Id. at 192. As in J-H-S-, the BIA declined to infer a reasonable possibility of such persecution from the reference in the 1995 Changle City Opinion to mandatory sterilization for unauthorized births, explaining that no record evidence indicated that the mandate "is implemented through physical force or other means that would amount to persecution." Id. The BIA was entitled to view the omission as significant in light of State Department evidence indicating that (a) "central government policy prohibits physical coercion to compel persons to submit to family planning enforcement," id. at 193 (citing

50

2002 Country Report § 1(f); 2006 Country Report § 1(f)); (b) even in Fujian Province, children born abroad might not be counted against the number of their parents' authorized births "'if not registered as permanent residents of China,'" id. (quoting 2007 Profile ¶ 112); and (c) enforcement efforts in Fujian Province were "lax" or "uneven," id. (citing 1998 Profile at 21, 26); see also id. at 193-94 (describing "wide variation" in how Fujian Province imposes penalty fees for unauthorized births (quoting 2005 Profile at 25)); id. at 194 (noting that British authorities similarly characterized enforcement policies in Fujian Province as lax (citing Country Info. & Policy Unit, UK Immigration & Nationality Directorate, China Country Assessment (Apr. 2002))).[27]

From this evidence, the BIA was further entitled to conclude that a reference in the 2006 Country Report to unattributed reports of forced sterilizations in Fujian Province of an unspecified number of women in undescribed circumstances did not persuasively demonstrate a reasonable possibility that Ji Wen Shi would face such persecution on removal to China. See generally Jian Xin Huang v. INS, 421 F.3d at 129 (observing that any evidence of forced sterilization of others must demonstrate circumstances sufficiently similar to petitioner's to provide "solid support" for claim of a well-founded fear of the same

---

[27] The British assessment suggested that enforcement of birth control policy "is less strict in Fujian than in any other province except Guangdong." Country Info. & Policy Unit, UK Immigration and Nationality Directorate, China Country Assessment (Apr. 2002) ¶ 6.26; see also 2001 Greenhalgh & Winckler Study at 158-60 (describing Changle county as a "good example of a coastal county with poor birth planning" and "an area of particularly lax enforcement," mainly due to families' strong preference for sons and leaders' failure to "take the lead").

persecution on removal). Indeed, as in J-H-S-, the BIA noted that its decision to accord little weight to the unattributed reports was reinforced by State Department interviews in 2006 with visa applicants from Fujian Province, which "yielded 'no evidence' of forced abortions or property confiscation." In re J-W-S-, 24 I. & N. Dec. at 194 (quoting 2007 Profile ¶ 99 (also reporting that consular officials traveling in Fujian Province reported no evidence of forced sterilizations or abortions)).

Accordingly, we conclude that substantial evidence supported the BIA's finding that Ji Wen Shi had not demonstrated a reasonable possibility that local enforcement policies would subject him to forced sterilization on removal to China.

### c. The BIA Did Not Deprive Ji Wen Shi of Due Process by Taking Administrative Notice of the 2007 Profile

Ji Wen Shi submits that the BIA's fact-finding is infected by a due process violation, specifically, the Board's reliance on a document not submitted into evidence by the parties, i.e., the State Department's 2007 Profile, without providing notice of its intent to do so or an opportunity to respond.[28]

#### (1) Taking Administrative Notice of the Most Recent Reports

The BIA's authority to take notice of State Department reports on conditions in foreign countries is provided for in 8 C.F.R. § 1003.1(d)(3)(iv) (authorizing "administrative

---

[28] It appears from our review of the record that the BIA relied upon three State Department documents that were not submitted by the parties in reaching its conclusions: the 2006 Country Report, and the 2005 and 2007 Profiles. At oral argument, however, Ji Wen Shi clarified that his challenge was limited to the BIA's use of the 2007 Profile.

notice of commonly known facts such as current events or the contents of official documents"). Indeed, this court has characterized as "well-settled" the BIA's "authority to take administrative notice of current events bearing on an [asylum] applicant's well-founded fear of persecution." Qun Yang v. McElroy, 277 F.3d 158, 163 n.4 (2d Cir. 2002). Further, while we have emphasized that State Department reports are not "binding" on the BIA, we have recognized that such reports are "'usually the best available source of information' on country conditions." Xiao Ji Chen v. U.S. Dep't of Justice, 471 F.3d 315, 341-42 (2d Cir. 2006) (quoting Zamora v. INS, 534 F.2d 1055, 1062 (2d Cir. 1976) (Friendly, J.)); see Yan Chen v. Gonzales, 417 F.3d 268, 274 (2d Cir. 2005).

Mindful of this precedent, we note that an earlier version of the State Department's Profile on China, specifically, its 1998 Profile, was part of the administrative record, having been put into evidence before the IJ at Ji Wen Shi's removal proceedings. See In re J-W-S-, I. & N. Dec. at 186 n.1 (identifying 1998 Profile among documents before IJ). Precisely because we have warned against reliance on outdated versions of State Department reports, see Tambadou v. Gonzales, 446 F.3d 298, 304 (2d Cir. 2006) (faulting BIA for relying on "outdated report that may not have accurately reflected the current conditions in Mauritania"); Tian-Yong Chen v. INS, 359 F.3d 121, 131 (2d Cir. 2004) (noting that 1995 Country Report may be of little value on remand to extent it "no longer necessarily reflects the current attitudes and responses of the Chinese authorities toward the practice of Roman Catholicism"), we think it reasonable that the BIA sought to expand the record to include the

53

most recent Profile. Thus, our singular concern is its decision to do so without affording the parties notice of this action or an opportunity to challenge any new information contained in the 2007 Profile.

(2)     The Lack of Notice Did Not Deprive Ji Wen Shi of Due Process

Procedural due process is a "flexible standard," the parameters of which "can vary . . . depending on '"the private interest that will be affected by the official action"' as compared to 'the Government's asserted interest, "including the function involved" and the burdens the government would face in providing greater process.'" United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004) (quoting Hamdi v. Rumsfeld, 542 U.S. 507, 529 (2004) (quoting Mathews v. Eldridge, 424 U.S. 319, 335 (1976))). "A court must carefully balance these competing concerns, analyzing '"the risk of an erroneous deprivation" of the private interest if the process were reduced and the "probable value, if any, of additional or substitute safeguards."'" Id. (quoting Hamdi v. Rumsfeld, 542 U.S. at 529 (quoting Mathews v. Eldridge, 424 U.S. at 335)). Recently, this court considered the process due an asylum applicant in a case where the BIA denied a motion to reopen "based solely on facts of which it took administrative notice." Chhetry v. U.S. Dep't of Justice, 490 F.3d 196, 198 (2d Cir. 2007). Chhetry had sought reopening based on a regime change in his native Nepal that he claimed put his life at risk on removal due to his support for the now-disfavored political party. In denying the motion, the BIA took notice of various website reports indicating that the political party supported by Chhetry had recently regained power. See id. at 198-99.

54

While we identified no error in the BIA "taking administrative notice of potentially dispositive facts," we concluded that "it did exceed its discretion in failing to provide Chhetry with an opportunity to rebut the significance of those facts before issuing its decision." Id. at 201 (remanding for further proceedings to afford petitioner opportunity to respond to noticed evidence).

In Burger v. Gonzales, we ruled that the due process concerns identified in Chhetry were not cured by the prospect of a motion to reopen: "due process requires th[e] same result before the BIA enters a final order of removal on the basis of administratively noticed facts." 498 F.3d 131, 132-33 (2d Cir. 2007). In that case, an IJ had granted Burger asylum, finding that her strong political views against the Milosevic regime, combined with her fame as an actress, gave rise to a well-founded fear of persecution on removal to Serbia-Montenegro. The BIA reversed, taking administrative notice of Milosevic's removal from power and his pending criminal trial before an international tribunal. Observing that the "administratively noticed facts constituted the sole basis" for the BIA's determination that Burger no longer harbored a well-founded fear of persecution, we concluded that the BIA had erred by failing to give petitioner "advance notice of its intention to consider [the] extra-record fact" of Milosevic's downfall and "the opportunity to rebut this fact's significance before issuing its decision." Id. at 135 (emphasis in original).

With these opinions in mind, we readily conclude that it would have been preferable for the BIA to have advised Ji Wen Shi of its intent to consider the 2007 Profile and to have

55

afforded him an opportunity to respond thereto.[29]  We are not persuaded, however, that the failure to do so resulted in a violation of due process requiring remand.

A critical fact informed our identification of a due process denial in both Chhetry and Burger: the judicially noticed facts were the sole basis for denying petitioners relief.  See Chhetry v. U.S. Dep't of Justice, 490 F.3d at 198 (referencing BIA's denial of motion to reopen based "solely on facts of which it took administrative notice"); see also Burger v. Gonzales, 498 F.3d at 135 (observing that "administratively noticed facts constituted the sole basis" for the reversal of asylum (emphasis in original)).  But for the noticed facts, petitioners had carried their burden to adduce evidence supporting their claims for relief (either reopening in Chhetry or asylum in Burger).  This case is quite different.  The 2007 Profile was not the sole ground for denying Ji Wen Shi (or any of the petitioners) relief from removal.  To the contrary, the BIA pointed to substantial evidence apart from the 2007 Profile to support its factual determination that Ji Wen Shi had failed to carry his burden to demonstrate a reasonable possibility of forced sterilization on removal to China.  Thus, the 2007 Profile was not "dispositive" of Ji Wen Shi's application for asylum.  Chhetry v. U.S. Dep't of Justice, 490 F.3d at 201.  Rather, the 2007 Profile simply corroborated the disposition already supported by the voluminous record evidence adduced by the parties.

_____

[29] We note that the BIA did not have the benefit of our decisions in Chhetry and Burger at the time it issued its precedential decision in J-H-S-.  But see In re S-Y-G-, 24 I. & N. Dec. at 251 n.2 (citing Chhetry in noting that petitioner had not challenged documents submitted by Department of Homeland Security on remand).  In light of those decisions, we strongly encourage the BIA to adopt procedures to alert the parties of any agency intent to take judicial notice of extra-record facts and to afford them an opportunity to be heard.

We emphasize that, even in these circumstances, we strongly urge the BIA to adopt procedures that will provide notice of and an opportunity to be heard on any administratively noticed facts. We do not, however, find that the failure to do so in this case rose to the level of a due process violation requiring remand.

3.  Show Yung Guo

a.  The BIA Acted Within Its Discretion in Denying Reopening

(1)  Standard of Review

Because Show Yung Guo's petition for review is from the BIA's denial of a motion to reopen, her burden is heavier than that of the other two petitioners who seek review from the BIA's adverse asylum rulings on direct appeal. This is because motions to reopen are generally "disfavored," INS v. Doherty, 502 U.S. at 323, in light of the "strong public interest" in the finality of removal orders, INS v. Abudu, 485 U.S. 94, 107-08 (1988) (recognizing that "[g]ranting such motions too freely will permit endless delay of deportation by aliens creative and fertile enough to continuously produce new and material facts") (internal quotation marks omitted). Consistent with this interest, time and number bars apply to motions to reopen. See 8 U.S.C. § 1229a(c)(7)(A), (C); 8 C.F.R. § 1003.2(c). An alien such as Show Yung Guo can invoke an exception to these bars "based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous hearing." 8 C.F.R. § 1003.2(c)(3)(ii). Even when

57

an alien satisfies the unavailability condition noted in this rule, however, her ability to secure reopening depends on a demonstration of prima facie eligibility for asylum, which means she must show a "realistic chance" that she will be able to obtain such relief. Poradisova v. Gonzales, 420 F.3d at 78. This requires the alien to carry the "heavy burden" of demonstrating that the proffered new evidence would likely alter the result in her case. INS v. Abudu, 485 U.S. at 110 (analogizing burden faced by alien seeking to reopen removal proceedings to that of criminal defendant moving for new trial); see Li Yong Cao v. U.S. Dep't of Justice, 421 F.3d 149, 156-57 (2d Cir. 2005) (citing In re Coelho, 20 I. & N. Dec. 464, 473 (B.I.A. 1992)).

We review a BIA decision to deny reopening deferentially for abuse of discretion. See Qin Wen Zheng v. Gonzales, 500 F.3d 143, 146 (2d Cir. 2007). We will identify such abuse only if the BIA's decision-making was "arbitrary or capricious," Poradisova v. Gonzales, 420 F.3d at 77, as evidenced by a decision that "provides no rational explanation" for the agency's conclusion, "inexplicably departs from established policies, is devoid of any reasoning, or contains only summary or conclusory statements," Qin Wen Zheng v. Gonzales, 500 F.3d at 146 (internal quotation marks omitted). In the absence of such concerns, however, we do not demand that the BIA "expressly parse or refute on the record each individual argument or piece of evidence offered by the petitioner." Zhi Yun Gao v. Mukasey, 508 F.3d 86, 87 (2d Cir. 2007) (internal quotation marks omitted). Still, as we noted in our remand order in this case, agency fact-finders have a particular duty explicitly

to consider relevant evidence of country conditions when a petitioner bases a motion to reopen on a purported change in those conditions. Where such consideration has been given, we review the BIA's fact-finding only for "substantial evidence." Ping Chen v. U.S. Att'y Gen., 502 F.3d 73, 75 (2d Cir. 2007); see Maghradze v. Gonzales, 462 F.3d 150, 152-53 (2d Cir. 2006).

(2)    Show Yung Guo's Claim of "Changed Country Conditions"

Show Yung Guo submits that the BIA erred in finding that she failed to demonstrate a change in country conditions. In explaining why we identify no merit in this argument, we begin by drawing a distinction between changes in the substance and in the enforcement of China's population control policy.

Substantial record evidence clearly supports the BIA's finding that Show Yung Guo failed to demonstrate a material change in the substance of China's population control policy, which, at all relevant times, has disfavored a family having more than one child. To the extent Show Yung Guo relied on documentary evidence from Fujian Province and Changle City family planning administrations to demonstrate a change in the enforcement of the policy — specifically, by clarifying that returning Chinese nationals who had violated population control policies abroad would be subject to the same enforcement as their countrymen whose violations had occurred in China — the BIA did not specifically rule that such evidence demonstrated a material change in country conditions. Instead, it appears to have concluded that, even if Show Yung Guo were given the benefit of the doubt on this

59

point, she was not entitled to reopening because she had not demonstrated prima facie eligibility for asylum. Specifically, she had not adduced evidence that convincingly established a reasonable possibility that she would face enforcement amounting to persecution. Because substantial evidence supports this determination, we identify no abuse of discretion in the denial of Show Yung Guo's motion to reopen.

(3) Show Yung Guo's Failure to Demonstrate *Prima Facie* Eligibility for Relief from Removal

(a) The BIA's Evidentiary Framework Manifests No Error of Law

In finding that Show Yung Guo had not demonstrated prima facie eligibility for asylum based on a fear of future persecution derived from her having two children, the BIA reviewed the evidence by reference to the same three-part evidentiary framework employed in J-H-S- and J-W-S-. Alone among the petitioners now before this court, Show Yung Guo asserts that this framework manifests legal error because it imposes a heavier burden on asylum applicants than permitted by the Supreme Court's decision in INS v. Cardoza-Fonseca, 480 U.S. at 440-41. We disagree.

We do not understand the three-step analysis identified by the BIA in J-H-S-, and employed by it in all three cases, to impose any burden of proof on asylum applicants, much less one at odds with the "reasonable possibility" standard referenced in INS v. Cardoza-Fonseca, 480 U.S. at 440. See 8 C.F.R. § 1208.13(b)(2)(i)(B). Rather, we understand the analysis simply to provide a framework for the agency's review of evidence to facilitate its

60

determination of when the reasonable possibility standard is satisfied by an applicant who claims a fear of future persecution based simply on the fact that he or she has more than one child. Such a framework is useful because, as the BIA noted, the understanding of China's population control policies and the means used to enforce them can vary widely from one area of the country to another. Thus, in assessing claims of feared future persecution on a case-by-case basis, it is appropriate to review the evidence to determine, first, what policy applies to the circumstances at issue and, second, whether local officials would be inclined to view the petitioner's actions as a violation of that policy. In the absence of evidence of such a policy and perceived violation, an alien could hardly demonstrate an objectively reasonable fear of any enforcement action, let alone enforcement amounting to persecution. On the other hand, where the record shows that local officials are likely to view petitioner's actions as a violation of a population control policy, the critical inquiry is the final one: whether officials will take enforcement action against petitioner that amounts to persecution. Because we do not understand the BIA's evidentiary framework to demand proof of more than a reasonable possibility of such abusive enforcement, we reject as without merit Show Yung Guo's legal challenge to that framework.

(b) <u>Substantial Evidence Supports the BIA's Finding that Show Yung Guo Failed to Demonstrate a Reasonable Possibility of Forced Sterilization on Removal to China</u>

In applying the three-part evidentiary analysis identified in <u>J-H-S-</u>, the BIA first expressed reservations as to whether the Fujian Province and Changle City documents

61

demonstrated that officials in those areas would view the birth of Show Yung Guo's second child as a violation of population control policies. It proceeded to find that, in any event, petitioner had failed to adduce convincing evidence of a reasonable possibility that she faced forced sterilization on removal to China.

i.   Uncertainty as to a "Perceived Violation"

The strongest evidence indicating that Chinese officials would perceive the birth of Show Yung Guo's second child in the United States as a violation of population control policies is derived from the pronouncements of Fujian Province and Changle City family planning authorities. In response to an inquiry about Zheng Yu He, whose wife had given birth to an unauthorized second child while visiting the United States, both authorities indicated that Zheng Yu He was subject to penalties for violating population control limits. The authorities explained that Chinese nationals who violated population control policies while abroad were subject to the same enforcement actions as countrymen whose violations occurred in China.

In explaining why it hesitated to infer from these documents that officials would view the birth of Show Yung Guo's second child in the United States as a violation of Chinese population control policies, the BIA pointed to record evidence suggesting that factual differences between petitioner and Zheng Yu He might incline authorities to view her circumstances more favorably. First, the 7-year interval between the births of Show Yung Guo's two children was somewhat longer than the 5½-year interval between the births of

Zheng Yu He's children. Further, Show Yung Guo had resided in the United States for many years, whereas Zheng Yu He's wife had been in this country only for a few months when she gave birth. Under these circumstances, the BIA questioned whether the conclusion reached by the Fujian authorities with respect to Zheng Yu He — that the birth of his second child in the United States was not subject to any exception from the one-child policy — necessarily applied to Show Yung Guo. See In re S-Y-G-, 24 I. & N. Dec. at 255-56 (noting that 2005 Profile at 21 suggested that longer intervals sometimes resulted in "increasingly relaxed" standards for authorizing birth of second child). Moreover, Zheng Yu He was a government employee and Communist Party member, a status calling for particularly strict application of population control limits, whereas Show Yung Guo was neither. See id. at 255 (noting that Changle City opinion referenced sanctions directly applicable to such employees and members); see also 2006 Country Report § 1(f) (indicating that persons who violate population control limits sometimes lose jobs or positions, and sometimes experience expulsion from the Communist Party, membership in which is required for certain jobs); 2005 Profile at 20 (noting that "government workers" and "employees of government-owned entities . . . are subject to especially strict controls with regard to maintaining the birth-limitation policy"). The BIA also noted, as it had in In re J-W-S-, 24 I. & N. Dec. at 190, that certain State Department reports and correspondence indicated that children born abroad are not always counted against a family, for example, if the children are not registered as permanent residents of China or are living permanently abroad. See In re S-Y-G-, 24 I. &

63

N. Dec. at 255 (citing Letter from Julieta Valls Noyes, Director, Office of Multilateral & Global Affairs, Bureau of Democracy, Human Rights & Labor, U.S. Dep't of State, to Randa Zagzoug, Deputy Chief Counsel, DHS-ICE (Jan. 9, 2007)).

At oral argument, counsel for Show Yung Guo submitted that it would be impossible to avoid registering a child with the Chinese government. Although counsel claimed record support for this argument, the documents he cites (a) are from provinces other than Fujian, (b) describe the procedures for registration, and (c) do not indicate what penalties, if any, apply for failing to register a foreign-born child. Moreover, other record evidence runs counter to counsel's contention. See 2007 Profile ¶¶ 112-13 (suggesting that parents of American-born children may choose not to register their children to avoid family-planning sanctions); 2005 Profile at 28 (noting that unregistered American-born children, specifically children who are American citizens traveling on American passports, are not eligible for free education in China, but that many parents pay tuition for them to attend private schools).

We do not ourselves attempt to resolve conflicts in record evidence, a task largely within the discretion of the agency. We conclude only that, because the BIA pointed to substantial evidence raising doubts as to how authorities in Fujian Province and Changle City would view the birth of Show Yung Guo's second child, and because the BIA did not overlook any record evidence favorable to petitioner, it was not compelled to resolve the violation step of analysis in her favor. We need not pursue the matter further, however, because the BIA concluded that, even if it were to assume that Show Yung Guo had

64

established a perceived violation, she failed to adduce evidence demonstrating a reasonable possibility of enforcement amounting to persecution.

> ii.    <u>Show Yung Guo's Failure to Demonstrate a Reasonable Possibility of Forced Sterilization</u>

In finding that the Fujian Province and Changle City documents did not demonstrate a reasonable possibility that Show Yung Guo would face forced sterilization on removal to China, the BIA essentially reiterated the reasoning expressed in <u>J-H-S-</u> and <u>J-W-S-</u>, discussed <u>supra</u> at **[38-44, 47-50]**.

First, the BIA determined that the documents pertaining to Zheng Yu He did not demonstrate such a possibility because they made no mention of <u>any</u> particular sanction or penalty. Second, the BIA explained that it was not persuaded that the reference to "mandatory" sterilizations in the Changle City Q & A Handbook signaled that officials would employ "<u>forcible</u> sterilization" because (a) no mention of such means was made in the Handbook, <u>In re S-Y-G-</u>, 24 I. & N. Dec. at 257 (emphasis in original); and (b) documentary evidence on family planning enforcement detailed a variety of non-forcible means — incentives, education, sanctions — used to achieve mandated objectives, <u>id.</u> at 256 (citing 2005 <u>Profile</u> at 20-21; <u>see also</u> <u>id.</u> at 24-26).[30] Indeed, the BIA concluded that the

---

[30] To the extent that, in <u>Shou Yung Guo v. Gonzales</u>, we may have appeared to have equated mandated sterilization with forced sterilization, <u>see</u> 463 F.3d at 115 (observing that Q & A Handbook "len[t] powerful potential support to a finding of changed circumstances because it states that a parent of two children such as Guo would, on her return, be subject[ed] to forced sterilization"), we did not hold that the BIA was compelled to reach that same conclusion on a full review of the record. Indeed, we remanded this case because it

"sanctions" applied to effect enforcement were "likely to be economic ones, as descriptions of those types of sanctions abound in published reports."  Id. at 256 (citing 2005 Profile at 21 and referencing discussion in J-H-S- and J-W-S- of State Department reports of "job loss and demotion, loss of promotions, expulsion from the Communist Party and attendant loss of employment, and destruction of property" as typical sanctions).  As for "occasional[]" reports of forced sterilization, the BIA observed that, because these lacked "details as to when, where, and how often," it could not reliably infer therefrom a reasonable possibility that Show Yung Guo would face such persecution on removal to China.  Id.  (internal quotation marks omitted).  This comports with our holdings in Ramsameachire v. Ashcroft, 357 F.3d at 178, and Jian Xing Huang v. INS, 421 F.3d at 129, requiring a petitioner's well-founded fear to be supported by reliable, specific, objective, and solid evidence.

In light of the BIA having conducted the record review required by our remand order and having pointed to substantial evidence to support its finding that Show Yung Guo has not demonstrated a reasonable possibility that she would face forced sterilization on removal to China, we cannot conclude that the BIA was compelled to find that she demonstrated prima facie eligibility for asylum or that the denial of her motion to reopen was an abuse of

---

was the BIA's responsibility to review the full documentary record and to make appropriate factual findings therefrom.  It was only because it was "not apparent" that the BIA had given consideration to the contents of the Fujian Province and Changle City documents in its initial denial of reopening that we ordered remand.  Id.  It is now clear that the BIA has done precisely what it previously failed to do, i.e., fulfilled its "'duty to explicitly consider any country conditions evidence submitted by an applicant that materially bears on [her] claim.'" Id. (quoting Poradisova v. Gonzales, 420 F.3d at 81).

66

discretion.

        (c)        <u>Show Yung Guo's Failure to Demonstrate Eligibility for Relief from Removal as an Asylee Refugee</u>

Show Yung Guo submits that, even if she failed to demonstrate eligibility for asylum based on her own fear of future sterilization, the BIA should have reopened her removal proceedings to consider her eligibility for relief as an asylee refugee. <u>See</u> 8 U.S.C. § 1158(b)(3)(A); 8 C.F.R. § 1208.21(b), (c). In support, she asserts that a visa petition was filed on her behalf by her husband, who was granted asylum on May 20, 2005. The argument is unpersuasive because, as the BIA found, Show Yung Guo has not offered any evidence that her visa petition has been approved so as to demonstrate <u>prima facie</u> eligibility for relief from removal. <u>See</u> 8 C.F.R. § 1208.21(c) (providing for visas to be granted in appropriate circumstances to relatives of persons granted asylum). The omission is particularly significant in this case because, as the government notes, Show Yung Guo's visa petition was, in fact, denied in July 2006 based on her failure to prove her identity. <u>See</u> <u>id.</u> § 1208.21(b). At oral argument, counsel asserted that Show Yung Guo was still endeavoring to secure a visa as an asylee relative, but he conceded that no favorable ruling had been obtained since the July 2006 denial.

Under these circumstances, we identify no abuse of discretion in the BIA's denial of Show Yung Guo's motion to reopen. <u>Cf.</u> <u>Pedreros v. Keisler</u>, 503 F.3d 162, 166 (2d Cir. 2007) (concluding, in context of pending appeal of denial of I-130 visa application filed by

67

petitioner's spouse, that there is "no basis for obligating the agency to grant continuances pending adjudication of an immigrant visa petition when there is a reliable basis to conclude that the visa petition or the adjustment of status will ultimately be denied").

b. The BIA Acted Within Its Discretion in Denying Reconsideration

Show Yung Guo asks this court to review the BIA's denial of her motion to reconsider its August 2, 2007 denial of her motion to reopen. A motion to reconsider must specify errors of fact or law in the challenged BIA decision and must be supported by pertinent authority. See 8 C.F.R. § 1003.2(b); Khan v. Gonzales, 495 F.3d 31, 36 (2d Cir. 2007). We review the denial of a motion to reconsider for abuse of discretion. Id. at 36. We identify none in this case because Show Yung Guo's motion did not point to errors of fact or law; it simply repeated arguments about changed country conditions, perceived violations of population control policies, and the reasonable possibility of forced sterilization on removal that the BIA had already rejected. See Jin Ming Liu v. Gonzales, 439 F.3d 109, 111 (2d Cir. 2006) (holding that petitioner cannot secure reconsideration simply by repeating "arguments that the BIA has previously rejected"). To the extent petitioner pointed to additional evidence obtained on the Internet to support her arguments, we cannot conclude that the BIA committed an error of fact based on evidence that was not part of the record at the time of the ruling. As the BIA observed, petitioner failed to explain why this additional evidence was not submitted at the time of the 2006 remand. See In re Show Yung Guo, A 72 461 714 (B.I.A. Feb. 27, 2008). In any event, the BIA reviewed the additional evidence and

68

determined that it was no more persuasive than that previously considered at the violation or enforcement steps of analysis. Because we identify no abuse of discretion in the BIA's denial of Show Yung Guo's motion for reconsideration, we deny this much of her petition for review for lack of merit.

### III. Conclusion

To summarize, we conclude:

(1) Because the BIA found wide variances in how population control policies are understood and enforced throughout China, it reasonably concluded that the "well-founded fear" requirement of 8 U.S.C. § 1101(a)(42) is not susceptible to a construction that categorically affords or denies refugee status to all Chinese nationals with more than one child.

(2) To the extent the BIA has employed a three-step evidentiary analysis to facilitate its case-by-case identification of those aliens with more than one child who possess a well-founded fear of persecution on removal to China, we discern no legal error in that framework. Specifically, we do not understand the analysis to impose a heavier burden of proof for the demonstration of a well-founded fear than the "reasonable possibility" standard identified by the Supreme Court in INS v. Cardoza-Fonseca, 480 U.S. at 440.

(3) Because the BIA did not overlook relevant evidence or commit any other legal error in determining that none of the petitioners now before the court convincingly

69

demonstrated a well-founded fear of forced sterilization on removal to China, we review that factual finding only for substantial evidence. As the BIA's finding is supported by substantial evidence in each case, particularly on the critical point that no petitioner has demonstrated a reasonable possibility that he or she will face forced sterilization on removal to China, we identify no error in its denials of asylum to petitioners Jian Hui Shao and Ji Wen Shi or in its denial of reopening or reconsideration to petitioner Show Yung Guo.

(4) With respect to petitioner Show Yung Guo, the BIA acted within its discretion in determining that she failed to adduce sufficient evidence to support reopening on the alternative ground that she qualified for relief from removal as an asylee refugee. Accordingly, the petitions for review are DENIED.