Lin v. Lynch

BIA
Brennan, IJ
A 088 517 180

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2015

Heard: August 25, 2015                    Decided: February 11, 2016

Docket No. 12-2163

- - - - - - - - - - - - - - - - - - - - - - - - - - -
WU LIN,
      Petitioner,

                  v.

LORETTA E. LYNCH, United States Attorney General,
      Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - -

Before: NEWMAN, WALKER, and JACOBS, Circuit Judges.

      Petition for review of the April 30, 2012, decision of the Board of Immigration Appeals, reversing a decision of an Immigration Judge that had approved an application for asylum.

      Petition granted and case remanded. Judge Jacobs concurs in the grant of the petition for review and remand to the BIA for further consideration with a separate opinion.

1

Gerald Karikari, Law Offices of Gerald Karikari, P.C., New York, NY, for Petitioner.

Ashley Y. Martin, United States Department of Justice, (Stuart F. Delery, Principal Deputy Assistant Attorney General, Mary Jane Candaux, Assistant Director, on the brief), Washington, DC, for Respondent.

JON O. NEWMAN, Circuit Judge.

This petition to review a decision of the Board of Immigration Appeals ("BIA") requires consideration of the standard of review for a court of appeals considering the BIA's determination that an Immigration Judge's ("IJ") findings of fact are clearly erroneous. This issue arises on a petition by Wu Lin for review of the BIA's decision of April 30, 2012, denying his application for asylum. We conclude that, although the BIA recognized its obligation to apply the "clear error" standard of review to the IJ's findings of fact, it erred in its application of that standard and provided an insufficient basis for rejecting the IJ's findings. We therefore grant the petition for review and remand to the BIA for further consideration.

2

## Background

Wu Lin is a native and citizen of the People's Republic of China. In August 2007 he entered the United States without authorization. Lin was apprehended in Texas a few days after his entry. In September 2007, an official of the Department of Homeland Security ("DHS") conducted a so-called "border interview" to determine whether Lin "indicate[d] either an intention to apply for asylum . . . or a fear of persecution," Immigration and Nationality Act § 235(b)(1)(A)(I), 8 U.S.C. § 1225(b)(1)(A)(i). Under oath, Lin stated that he would be imprisoned if returned to China. Asked why, he answered, "I was working for the birth control department in China and I let two women go . . . without having the procedure."

As a result of the border interview, Lin was referred for a so-called "credible fear" interview conducted in September 2007 by an asylum officer to determine whether Lin "ha[d] a credible fear of persecution," 8 U.S.C. § 1225(b)(1)(B)(ii), which means "a significant possibility . . . that the alien could establish eligibility for asylum," 8 U.S.C. § 1225(b)(1)(B)(v). Lin testified that his reason for believing that he would be persecuted if returned to China was that he was arrested and fined when he

3

"went to reason with the people in the family planning"
after they forced his girlfriend to have an abortion.  The
asylum officer asked Lin why he had told the Border Patrol
that he feared imprisonment because he had helped two women
escape from the birth control department.  He answered,
"[W]hen I was there with them, they told me I did not have
to say me [*sic*] the whole story there, but to tell it to the
immigration officer." Lin  added, "I released two women that
were nine months pregnant.

Lin filed a written application for asylum in July
2008.  Abandoning his claims made at the border and credible
fear interviews, Lin wrote that he had been persecuted by
the Chinese government by beatings and detention because of
his practice of Falun Gong.  He explained the recantation of
his previous claims by stating that he had been instructed
by the snakeheads (smugglers) on the way to the United
States to say certain things and that if he did not say what
he was told he would be sent back to China and have to pay
the smuggling fees.  Lin's testimony before the IJ repeated
what he had written in his asylum application.

In an oral decision, the IJ credited Lin's testimony.
She found that Lin had "reasonably explained" his previous
versions and was "satisfied" with Lin's explanation."

4

[T]his is an example," the IJ stated, "of the power of the snakeheads to whom he owed money and to whom he owed his presence and entry into the United States." Then, evidently contemplating an appeal by DHS, the IJ added, "This is an example for any reviewing Court of the power of the snakeheads over [asylum seekers] who are coming to America." The IJ said she "g[a]ve great weight to the fact that [Lin] came forward voluntarily to withdraw those statements and to explain why he said those statements." With respect to Lin's current claim, the IJ said she credited Lin's practice of Falun Gong and the detention and beatings he had suffered while detained in China. The IJ also found that Lin had "produced reasonably available evidence to support his claim," referring to a letter from Lin's father, a letter from his co-practitioner in China, a copy of the dismissal notice from his employer, a sworn affidavit from his uncle, and several identity documents. The IJ exercised her discretion to grant Lin asylum.

DHS appealed the IJ's decision to the BIA. The BIA began its opinion by recognizing that its regulations required it to review an IJ's findings of fact under the "clearly erroneous" standard. *See* 8 C.F.R.

5

§ 1003.1(d)(3)(i).  The BIA stated, "There is clear error in a factual finding when we are left with the definite and firm conviction that a mistake has been made." *In re Wu Lin*, No. A088 517 180, at 1 (B.I.A. Apr. 30, 2012).  The BIA ruled that the IJ had "committed clear error in crediting [Lin's] explanation for his repeated lies to immigration officials." *In re Wu Lin*, No. A088 517 180, at 2.  The BIA also stated, "[W]e find clear error in the [IJ's] determination that [Lin's] third asylum claim based on his practice of Falun Gong was credible." *Id.* at 3.  Based on these rulings, the BIA reversed the IJ's grant of asylum. We consider the BIA's reasons for these rulings below.

## Discussion

In nearly all the petitions for review of asylum claims that reach this Court, the BIA has affirmed an IJ's denial of asylum.  In the pending petition for review, however, the BIA, applying the "clear error" standard of review, has reversed an IJ's grant of asylum.[1]  The initial issue for us is what standard of review should we apply to the BIA's ruling that an IJ's findings of fact are clearly erroneous.

---

[1] If the BIA grants asylum, either by affirming an IJ's grant of asylum or by reversing an IJ's denial of asylum, DHS is not authorized to seek review in this Court.

This is an issue that rarely arises in judicial review of agency decisions because an agency's use of a "clear error" standard to review findings of fact is itself rare. Under the Administrative Procedures Act, "[o]n appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision except as it may limit the issues on notice or by rule." 5 U.S.C. § 557(b). Thus, most agencies reviewing findings of fact are entitled to find facts, *i.e.*, "use the powers [they] would have in making the initial decision."

However, the BIA is subject to a different regime. The Department of Justice ("DOJ"), acting pursuant to the "except" clause of section 557(b), has required the BIA, which is a constituent entity within DOJ,[2] to review an IJ's findings of fact under the "clear error" standard: "Facts determined by the immigration judge, including findings as to credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous." 8 C.F.R. § 1003.1(d)(3)(i). DOJ also prohibited the BIA from making findings of fact: "Except for taking administrative notice of commonly known facts such as

---

[2] "There shall be in the Department of Justice a Board of Immigration Appeals . . . ." 8 C.F.R. § 1003.1(a)(i).

7

current events or the contents of official documents, the Board will not engage in factfinding in the course of deciding appeals." *Id.* § 1003.1(d)(3)(iv).

DOJ has explained that "[t]he [Justice] Department's adoption of the 'clearly erroneous' standard encompasses the standards now commonly used by the federal courts with respect to appellate court review of findings of fact made by a trial court." Board of Immigration Appeals: Procedural Reforms to Improve Case Management, 67 Fed. Reg. 54878-01, 54890 (Aug. 26, 2002). Those standards are set forth in Rule 52(a)(6) of the Federal Rules of Civil Procedure:

> "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."

So when the BIA reviews an IJ's findings of fact, it must accept them unless they are clearly erroneous, and the BIA must give "due regard" to the IJ's opportunity to judge a witness's credibility.

Before determining how we should review a BIA ruling that an IJ's findings of fact are clearly erroneous, we endeavor to consider what "clear error" review means. We are not encouraged in this task by Judge Learned Hand's

8

observation that "[i]t is idle to try to define the meaning of the phrase, 'clearly erroneous,'" *United States v. Aluminum Co. of America*, 148 F.2d 416, 433 (2d Cir. 1945), or the Supreme Court's later acknowledgment that "the meaning of the phrase 'clearly erroneous' is not immediately apparent," *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985).

The most frequently expressed statement of the meaning of "clear error" review was first provided by the Supreme Court in *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948): "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." The Court has repeatedly used this formulation. *See*, *e.g.*, *Anderson*, 470 U.S. at 573; *McAllister v. United States*, 348 U.S. 19, 20 (1954). The BIA itself repeated a portion of this formulation when it rejected, under the "clear error" standard, the IJ's findings in this case. "There is clear error in a factual finding when we are left with the definite and firm conviction that a mistake has been made." *In re Wu Lin*, No. A088 517 180, at 1 (B.I.A. Apr. 30, 2012).

The "definite-and-firm-conviction" formulation provides little, if any, guidance as to the circumstances that would permit a reviewing court to conclude that a factfinder has committed "clear error."  Indeed, the formulation can be misleading if it is misunderstood to mean that a reviewing court can reject a finding of fact simply because the court subjectively believes that the factfinder was mistaken. The formulation purports to be an explanation of when a factfinder has committed "clear error," but the key question is what constitutes "clear error."

The Supreme Court's most quoted attempt to explain "clear error" identifies what the phrase does not mean:

> "[C]ertain general principles governing the exercise of the appellate court's power to overturn findings of a district court may be derived from our cases. . . .  This standard ["clear error" review] plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.  The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court.  In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo.  If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."

10

*Anderson*, 470 U.S. at 573-74 (citation and internal quotation marks omitted).

Some examples of clear error can be readily imagined. There might be no evidence at all to support a finding of fact. Or the finding might be controverted by indisputable evidence, as when indisputable evidence establishes that an asylum witness claiming to have been beaten was at a location far from where he claimed the beating occurred. Of course, such extreme examples of clear error are not likely to arise. A more likely example might arise where an IJ has obviously misunderstood the testimony of a witness and based a finding of fact on that misunderstanding. Situations might also arise where the evidence opposed to the claimant's version, though not indisputable, has overwhelming persuasive force. How overwhelming the opposing evidence must be will often be a close question for the entity applying clear error review and for the court reviewing a clear error conclusion. What is not in doubt, however, is that the phrase "clear error" is to be taken literally: the error must be clear.

One aspect of "clear error" review that has been generally recognized is that it is less deferential to a factfinder than "substantial evidence" review. In

11

*Dickinson v. Zurko*, 527 U.S. 150, 152-53 (1999), Justice
Breyer explained a significant difference between appellate
court application of the "clear error" standard to a bench
trial judge's finding of fact (what he called "court/court
review") and its application of the "substantial evidence"
standard to an agency's finding of fact (what he called
"court/agency" review).  "Traditionally, this court/court
standard of review has been considered somewhat stricter
(*i.e.,* allowing somewhat closer judicial review) than the
APA's court/agency standards." *Id.* at 153 (citing 2 Kenneth
Culp Davis & Richard J. Pierce, Jr., *Administrative Law
Treatise* § 11.2 (3d ed. 1994)).  In other words, even if
there is substantial evidence to support a finding of fact,
a reviewing court or an agency like the BIA can conclude,
with sufficient justification, that a "clear error" has
been committed.[3]  A leading treatise agrees:  "If the

---

[3] In *Easley v. Cromartie*, 532 U.S. 234, 246-57 (2001),
the Supreme Court, reviewing for clear error the findings
of fact of a three-judge district court in a
reapportionment case, made a meticulous analysis of the
testimony of several witnesses before concluding that clear
error had occurred.  The Court's approach might have been
influenced by the Court's reluctance to interfere with a
state legislature's reapportionment decisions. "The Court
also has made clear that the underlying districting
decision is one that ordinarily falls within a
legislature's sphere of competence." *Id.* at 242.

12

findings of fact are against the clear weight of the evidence or the appellate court otherwise reaches a definite and firm conviction that a mistake has been made by the trial court, the appellate court will set the findings aside even though there is evidence supporting them that, by itself, would be considered substantial." 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2585 (3d ed. 2007). With this understanding of "clear error" review, we now turn to how a court reviews a court or an agency decision rejecting a finding of fact upon "clear error" review.

The most familiar context in which an appellate court reviews another tribunal's application of a "clear error" standard to a finding of fact is the Supreme Court's review of a court of appeals decision that a district court's finding of fact is clearly erroneous. In this three-layered context, the Supreme Court puts itself in the shoes of the court of appeals and makes a *de novo* decision as to whether *it* has a definite and firm conviction that a mistake has been made. *See Anderson*, 470 U.S. at 577;

13

*McAllister*, 348 U.S. at 20-21.[4] However, in the three-layered context of court review of an *agency's* application of the "clear error" standard to an IJ's finding of fact, we have no authority to displace the BIA and apply the "clear error" standard to an IJ's finding of fact.

Courts of appeals conduct three-tiered court/agency review in other contexts that are somewhat analogous to our review of the BIA's application of the "clear error" standard, but these contexts are sufficiently different to be unhelpful to our inquiry. The first concerns the Tax Court. The Tax Court by rule has adopted a highly deferential standard for reviewing a Special Trial Judge's recommended findings of fact. "[T]he findings of fact recommended by the Special Trial Judge shall be presumed to be correct." Tax Ct. R. 183(d). Whether or not this standard is as deferential as "clear error" review, Courts of Appeals are statutorily instructed to review a Tax

---

[4] Where the Supreme Court reviews a decision of a court of appeals that has upheld a finding of a trial court, the Court generally applies what it calls "the two-court rule," declining to reexamine the finding. *See*, *e.g.*, *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 336 U.S. 271, 275 (1949) ("A court of law, such as this Court is, . . . cannot undertake to review concurrent findings of fact by two courts below in the absence of a very obvious and exceptional showing of error.").

14

Court's findings "to the same extent as decisions of the district courts in civil actions tried without a jury," 26 U.S.C. § 7482(a)(1), *i.e.*, under the "clear error" standard. We have no similar authority with respect to BIA application of the "clear error" standard.

The second context concerns the Court of Appeals for Veterans' Claims. That Court applies "clear error" review to a factual determination of the Board of Veterans' Appeals. *See* 38 U.S.C. § 7261(a)(4). However, the Court of Appeals for the Federal Circuit, which reviews rulings of the Court of Appeals for Veterans' Claims, is explicitly precluded from reviewing a challenge to a factual determination. *See* 38 U.S.C. § 7292(d)(2).

With no special guidance from these two possible analogies, we are left with our traditional approach to reviewing a ruling of law – *de novo* review. The BIA's application of "clear error" review is the application of a legal standard to findings of fact and as such is a ruling of law. *See Kabba v. Mukasey*, 530 F.3d 1239, 1245 (10th Cir. 2008). However, *de novo* review does not mean that we can redetermine *de novo* whether we think the IJ has committed clear error. It means that we must determine

15

whether the BIA has provided sufficient justification for its conclusion that the IJ has committed clear error. It also means that we must make sure that the BIA has not violated the prohibition against making its own findings of fact.

Sometimes the distinction between a BIA's permissible ruling that an IJ has committed clear error and the BIA's prohibited finding of fact might appear to turn on how the BIA explains its decision. If the BIA says it "finds" that the evidence establishes the opposite of what an IJ has found, the BIA would appear to be finding a fact, which it is not permitted to do. On the other hand, if the BIA says that, after considering the entire record, it concludes that the IJ has committed clear error in making a finding of fact and provides a legally sufficient explanation for its conclusion, its ruling will ordinarily be upheld.

We do not mean to imply that a BIA ruling "finding" a fact to be the opposite of what an IJ had found must always be rejected merely because the BIA used the terminology of factfinding. Reviewing courts sometimes say that they "find" that something is so, e.g., that a party's legal contention is invalid, even though they are not finding a

16

fact but, instead, stating a ruling of law. If, for example, a reviewing court ascertains as a matter of law that the evidentiary record cannot sustain an IJ's factual finding and therefore compels the conclusion reached by the BIA, rejecting the BIA's ruling merely because the BIA used the wrong terminology in expressing a legally compelled result would be senseless. At the same time, the BIA should be mindful that careless use of factfinding terminology when its intention is to rule, with explanation, that an IJ's factfinding was clearly erroneous can cause confusion and unnecessary remands.

Just as we require an IJ to give "specific, cogent reasons" to support rulings, *see Cao He Lin v. U.S. Dep't of Justice*, 428 F.3d 391, 400 (2d Cir. 2005) (internal quotation marks omitted), we expect the BIA to supply cogent reasons for its rulings. *See Vitug v. Holder*, 723 F.3d 1056, 1063 (9th Cir. 2013) ("Under clear error review, if the BIA rejects a finding of the IJ, . . . the BIA [is] obligated to explain why the IJ clearly erred in so finding.").

The three cases in this Circuit reversing the BIA for an invalid application of the "clear error" standard

17

reflect this approach. Our first encounter with a BIA decision ruling that an IJ's finding of credibility was clearly erroneous was *Fen Yong Chen v. Bureau of Citizenship & Immigration Services*, 470 F.3d 509 (2d Cir. 2006). We rejected the BIA's ruling. *See id.* at 514-15. We noted that, although the IJ had explained why he discounted inconsistencies between the applicant's hearing testimony and his prior credible fear interview, the BIA "gave no explanation for why it rejected the IJ's reasons for discounting [that] interview." *Id.* at 514. The BIA, we ruled, "started anew, conducting its own credibility analysis." *Id.*

Similarly, in *Sherpa v. Holder*, 374 F. App'x 104 (2d Cir. 2010), where the BIA rejected an IJ's finding that the applicant was credible, we rejected the BIA's ruling because the BIA had "reached its own credibility determination." *Id.* at 105. In *Padmore v. Holder*, 609 F.3d 62 (2d Cir. 2010), we ruled that the BIA had engaged in impermissible factfinding in determining, contrary to an IJ's ruling, that cancellation of removal was not

18

warranted. *See id.* at 68-69.[5]

In the pending matter, the IJ found as a fact that Lin was credible in testifying about his persecution because of his Falun Gong activity. The IJ also was "satisfied" with Lin's explanation for his false statements at the border and credible fear interviews. The IJ specifically credited Lin's testimony that he feared being returned to China and forfeiting money unless he gave the two prior statements as instructed by the snakeheads. That threat, the IJ found, "is an example . . . of the power of the snakeheads."

In rejecting the IJ's findings, the BIA first stated the indisputable fact that Lin had presented three different asylum claims, *i.e.*, his release of two women at the family planning office, his opposition to his girlfriend's abortion, and his persecution for practicing Falun Gong.

The BIA ruled that Lin's explanations for the first two claims, which he recanted at his hearing, "are not

---

[5] In *Shao v. Mukasey*, 546 F.3d 138 (2d Cir. 2008), we found no error in the BIA's finding of subsidiary facts bearing on whether Ji Wen Shi, one of the three asylum claimants, had an objectively reasonable fear of persecution because the parties had consented to factfinding by introducing new evidence before the BIA. *See id.* at 162.

19

plausible or consistent." The BIA offered two reasons for this ruling. First, "[Lin] has not demonstrated that he would not have had to pay the smuggling fees regardless of whether he was successful on his asylum claim." **[*Id.*]** The BIA gave no indication as to how Lin might have demonstrated that the snakeheads would have delivered on their threat. We cannot imagine that the BIA expected Lin to call the snakeheads as witnesses. There is no indication that their whereabouts at the time of the hearing was known. More important, the issue, pertinent to Lin's credibility, was not whether the snakeheads would have carried out their threat, but whether Lin believed that they would, and gave his false versions because of that belief.

We can readily understand the BIA's skepticism that Lin was being truthful in stating his third reason for seeking asylum after stating, at his border and credible fear interviews, two reasons that were false. Prior false testimony is often a basis for disbelieving a witness's later testimony. But the issue for the BIA was not whether Lin was telling the truth when he gave his third reason for seeking asylum. That was an issue of fact for the IJ. The

20

issue for the BIA was whether it had sufficient justification for ruling that the IJ had clearly erred in finding that Lin's third reason was truthful.

The IJ not only found that the third reason was truthful, but explained why she so found. First, she counted in Lin's favor the fact that Lin came forward and acknowledged the falsity of his two prior reasons. Second, she deemed entirely plausible Lin's explanation that he gave false reasons because he was threatened by the snakeheads to do so. *See Kabba*, 530 F.3d at 1246 ("[T]he IJ found that [the claimant] offered a legitimate explanation. This was a factual finding entitled to deference on review."). Third, she considered Lin's demeanor supportive of the truthfulness of his hearing testimony. *See* Fed. R. Civ. P. 52(a) ("[T]he reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.").

In view of the IJ's explanation for her finding, the BIA did not provide us, as a reviewing court, with a supportable basis for its conclusion that Lin's explanation for his initial false testimony was not "plausible" and its consequent ruling that the IJ committed clear error.

21

The BIA also deemed Lin's explanations "inconsistent." The first example of a claimed inconsistency was that when asked to explain his false versions before the IJ, he first testified that he "had no idea about American laws" when he was apprehended at the border, but later testified that he was informed about asylum law before the critical fear interview. These statements, however, are not inconsistent. Nothing in the record undermines Lin's unsurprising testimony that he knew nothing about American law when he was apprehended at the border. That lack of knowledge is not inconsistent with his testimony that after his release from custody, which preceded his credible fear interview, he "consult[ed] with a lawyer" and "then I realized American law protects people from being persecuted." Thus, the record refutes the BIA's first claimed inconsistency.

The BIA's second example of a claimed inconsistency in Lin's testimony was his statement that he did not talk with his attorney while he was in custody and his later statement that he was represented by an attorney while in custody. Again, there is no inconsistency. It is regrettable, but not uncommon, that a person in custody has not spoken to his lawyer until after his release from

custody. Lin also testified that, while in custody, the lawyer's "assistant telephone[d] me," but the record does not indicate that the assistant was a lawyer. The BIA's second claimed inconsistency is not supported by the record.

On this record, the BIA's "clear error" rejection of the IJ's findings is not adequately supported and must itself be rejected. On remand, the BIA will have to either accept the IJ's findings or, if it can, provide a supportable basis for rejecting them.

## Conclusion

The petition for review is granted, and the case is remanded for further consideration consistent with this opinion.

23

DENNIS JACOBS, Circuit Judge, concurring in the grant of the petition for review and remand to the BIA for further consideration:

Petitioner has advanced three successive reasons for needing asylum. Each is an archetypal asylum narrative: (1) helping women escape an abortion clinic, (2) opposing his girlfriend's forced abortion, (3) practicing Falun Gong. The immigration judge ("IJ") credited the third narrative after Petitioner withdrew the first two, and granted asylum. The Bureau of Immigration Appeals ("BIA") was "left with the definite and firm conviction that a mistake [was] committed," see United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948), and therefore rejected the IJ's credibility finding as clearly erroneous and denied relief.

No one can doubt that, considering (as must be done) the totality of circumstances, there is room for profound skepticism. The reason for persecution is the essence of an asylum claim; it is implausible that anyone forced from his land by persecution would not know why; yet this Petitioner lied about it (at least) twice. The majority remands for the BIA to adduce further reasons for its definite and firm conviction that Petitioner is lying now.

1

**I**

I agree with the majority opinion as to the legal standards that govern our review of the BIA.  The BIA's review of the IJ's fact-finding is for clear error.  When the BIA has concluded that clear error has been committed, our review is not de novo; rather, we decide whether the BIA has provided sufficient justification for its conclusion.  Inherent in this distinction is the possibility that the BIA might believe the IJ committed clear error, while we might believe the IJ did not, and both conclusions might have "sufficient justification."

I deviate from the majority opinion because, in my view, the BIA had ample reason to conclude that clear error was committed, given that the BIA reviews the totality of circumstances, and that the circumstances include two prior false narratives.  But I concur rather than dissent because I see no harm in a remand to the BIA (to explain the obvious), and because specificity of reasons is good practice.

**II**

The REAL ID Act directs the agency to make a credibility determination in asylum proceedings based on the "totality of the circumstances" and "all relevant factors." 8 U.S.C. § 1158(b)(1)(B)(iii). Among the factors bearing on credibility listed in the statute are candor, the inherent plausibility of the applicant or witness's account, and consistency of account. Id. Thus an adverse credibility determination may be premised even on inconsistencies that do not "directly relate to the applicant's claim of persecution," so long as the totality of the circumstances establish that an applicant is not credible. Xiu Xia Lin v. Mukasey, 534 F.3d 162, 164-65 (2d Cir. 2008) (per curiam) ("Under the standard established by the REAL ID Act, an IJ is required to evaluate inconsistencies in light of the 'totality of the circumstances.'").

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." U.S. Gypsum Co., 333 U.S. at 395. This formulation of clear error coincides nearly verbatim with the BIA's own regulations governing its standard of review. See Board of Immigration Appeals: Procedural Reforms To Improve Case Management, 67 Fed. Reg.

54,878-01, at 54,889 (Aug. 26, 2002) (citing Anderson v. City of Bessemer, 470 U.S. 564, 573 (1985)).

The BIA determined that Petitioner's explanations for his lies "are not plausible or consistent," and that the IJ committed clear error in determining that Petitioner "reasonably and credibly explained his repeated lies to immigration officials." Certified Administrative Record ("CAR"), at pp.4-5. The BIA is the agency charged with administering our nation's immigration laws, and so it is their definite and firm conviction that matters, not ours.

Among the totality of circumstances here are Lin's shifting claims. On September 3, 2007, he issued a sworn statement that he feared returning to China because he released two pregnant women while working for a birth control facility. During his credible fear interview with an asylum officer ten days later, he testified that he feared returning to China because his mistress suffered a forced abortion, which he opposed. None of those things ever happened to Lin. At his hearing before the IJ, he recanted the stories about his heroism in the clinic and the tragedy of his girlfriend's forced abortion, and unveiled the entirely new claim that he suffered persecution in China for practicing Falun Gong, the account that was credited by the IJ.

4

To support its conclusion that the BIA improperly applied clear error review, the majority opinion principally relies on Chen v. Bureau of Citizenship & Immigration Services, 470 F.3d 509 (2d Cir. 2006). In that case, the BIA ruled that discrepancies between the asylum applications and the asylum interview were dispositive as to that petitioner's credibility. We remanded because the BIA had substituted its (adverse) credibility finding for the IJ's, without "point[ing] to any misstatements of fact, errors in analysis, flawed reasoning, or improper applications of law," and thus performed (impermissible) de novo review. Id. at 514. Chen does not control the present case. In Chen, the discrepancies were in the details of the asylum claim, such as how Chen managed to escape from family planning officials after he was arrested. Id. at 512. Here, the falsehoods are not mere discrepancies concerning particulars; the two recanted falsehoods (like the third account) concern why Petitioner needs asylum at all. Cf. Ye v. Dep't of Homeland Sec., 446 F.3d 289, 295 (2d Cir. 2006) ("Because the BIA has identified a material inconsistency in an aspect of [Petitioner's] story that served as an example of the very persecution from which he sought asylum, we hold that the inconsistency afforded substantial evidence to support the adverse credibility finding." (citations and quotation marks omitted)).

5

**III**

Lin told the IJ that he advanced the two false (coercive population control) claims because he was told to do so by the snakeheads, who threatened that otherwise, if he were returned to China, his smuggling fees would not be forgiven.

There are sufficient reasons, implicit in the facts, for rejecting this explanation. The plausibility of the explanation for outright fabrication is itself sapped by the lie it is offered to explain. Moreover, as the BIA pointed out, there is no indication that Lin would ever be relieved of his obligation to pay the snakeheads the smuggling fees, regardless of whether his asylum claim was successful. Snakeheads do not have the refund policy of American department stores.

Moreover, the three successive accounts are not incompatible; so the snakeheads' requirement that he proffer one false account or another does not logically preclude his offering the truth, if only as belt and suspenders. Neither the IJ nor the majority has posited a plausible explanation for why the Falun Gong fears were omitted. See Xiu Xia Lin v. Mukasey, 534 F.3d 162, 166 n.3 (2d

6

Cir. 2008) ("An inconsistency and an omission are, for [credibility] purposes, functionally equivalent.").

The majority argues that the proper question is not whether the snakeheads would actually carry out their threat, but rather whether Lin believed they would and committed perjury "because of that belief." Maj. Op. at ____. However, any such subjective belief must still be objectively reasonable. Cf. Ramsameachire v. Ashcroft, 357 F.3d 169, 178 (2d Cir. 2004) ("[A] well-founded fear of future persecution . . . requires that the alien present credible testimony that he subjectively fears persecution and establish that his fear is objectively reasonable.").

It is not objectively reasonable to believe that snakeheads conduct their business on honorable principles, that they give refunds, that any undertakings by them can be enforced in any forum, or even that they can be found for enforcement of contract obligations.

Additionally or alternatively, Lin claims that he failed to advance his Falun Gong claim because he "had no idea about American laws." CAR at p.4. The plausible inference is that, if Lin had known that practicing Falun Gong was a valid basis for an asylum claim, he would have made it in his initial interviews.

But Lin was given an open-ended opportunity to tell the immigration officials about *any* fear he had about being sent to China.  He was advised:

> U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country.  If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance.

CAR at pp.197, 295.

The BIA and the majority opinion consider whether Lin made any inconsistent statements about speaking to a lawyer.  But those questions bear only upon when Lin would have become aware that Falun Gong was his ticket to stay in the United States.  So it does not matter whether Lin made any inconsistent statements about speaking to or being represented by a lawyer.  Nothing about his supposed ignorance of our law accounts for why he did not express a supposedly truthful fear of persecution for practicing Falun Gong, either on September 3 or September 13, 2007.  He was told to tell the truth, the interviews were conducted in Mandarin (which Lin said was his best language), and there is no evidence that Lin failed to understand the questions.  See Yun Zui Guan v. Gonzales, 432 F.3d 391, 398-99 (2d Cir. 2005) (noting factors to determine reliability of asylum and credible fear interviews, including whether alien

8

understood the questions posed and whether those questions elicited details of an asylum claim).

Ignorance of American asylum law cannot assist Lin unless he was ignorant of the obligation to tell the truth, notwithstanding that that obligation was impressed upon him by immigration officials. In another context, we have held that "even an alien who is unfamiliar with the technicalities of immigration law can, under certain circumstances, be expected to comprehend that he has received ineffective assistance without being explicitly told so by an attorney." Rashid v. Mukasey, 533 F.3d 127, 132 (2d Cir. 2008). It makes no sense to impose on aliens stricter requirements to know that their lawyer is being ineffective than for knowing their own reasons for being afraid to return to their home country. Cf. Cheek v. United States, 498 U.S. 192, 199 (1991) ("The general rule that ignorance of the law or a mistake of law is no defense . . . is deeply rooted in the American legal system.").

In any event, truth is not a quirk of American procedure.

*　*　*

I understand entirely the reasons why the BIA formed a "definite and firm conviction" that a mistake has been made. For that reason, however, the remand

9

will entail no heavy lifting on the part of the BIA, and when it comes to reasoned

dispositions, more cannot hurt.